STATE of Maine

v.

Henry SPRAGUE.

Supreme Judicial Court of Maine.

Nov. 8, 1978.

Rae Ann French (orally), Vernon Arey, Asst. Attys. Gen., Augusta, for plaintiff.

Craig E. Turner (orally), South Paris, for defendant.

Before McKUSICK, C. J., and ARCHI-BALD, DELAHANTY, GODFREY and NICHOLS, JJ.

McKUSICK, Chief Justice.

Defendant Henry Sprague appeals from his conviction for homicide in the second degree under former 17–A M.R.S.A. § 202(1)(A) [1] (repealed and replaced by P.L.

---

1. 17–A M.R.S.A. § 202(1)(A) provided:
"§ 202. Criminal homicide in the 2nd degree.
"1. A person is guilty of a criminal homicide in the 2nd degree if:

"A. He causes the death of another intending to cause such death, or knowing that death will almost certainly result from his conduct . . . ."

1977, ch. 510, § 39) on the following grounds: (1) the presiding justice erred in admitting certain evidence under the "dying declaration" exception to the hearsay rule; (2) the evidence was insufficient to support the jury's finding that defendant possessed the requisite "mens rea"; (3) the presiding justice erred in failing to adopt defendant's proposed instructions regarding self-defense; and finally, (4) the presiding justice's instruction that self-defense could not be raised as a defense to charges of homicide in the 4th and 5th degrees constituted prejudicial error. We reject each contention and deny the appeal.

Henry Sprague separated from his wife, Nancy Sprague, in October of 1976. However, the couple continued to cohabit occasionally, both at Nancy Sprague's trailer and at the hotel where defendant resided. On the evening of Friday, May 6, 1977, Nancy Sprague attended a dance, unaccompanied by defendant, and met Robert Cline. Cline and Nancy Sprague left the dance in separate vehicles. However, Cline had indicated that he might visit Nancy Sprague at her trailer later that night, and the couple also made tentative plans to go horseback riding on the following day. On the way home from the dance, Nancy Sprague stopped by defendant's hotel and invited defendant to spend the rest of the night at her trailer. At about 4:00 a. m.—after the Spragues had returned to Nancy Sprague's trailer and had retired—Robert Cline arrived at the trailer and knocked on the door. Nancy Sprague refused to allow Cline to enter, and he went away, to return in the late forenoon. Nancy told defendant that the visitor was someone she had met at a dance the previous evening.

On arising later that morning of Saturday, May 7, Nancy Sprague drove defendant back to his hotel and then spent the remainder of the day with Cline. At about 8:00 p. m. Saturday evening, Nancy Sprague and Cline went on a date in Nancy's car, leaving Cline's pickup truck parked in front of the trailer. Defendant's sister and her boyfriend and the Spragues' two children remained behind. Later that evening defendant journeyed from his hotel to the trailer, discovered that his wife was not present, and stayed in the trailer. At approximately 11:00 p. m. Nancy Sprague and Cline returned and parked her car outside the trailer. As Cline approached the door of the trailer, defendant suddenly emerged, wielding a knife and "hollering" at Cline. Defendant claims that he was yelling for Cline to leave. Nancy Sprague testified that defendant screamed, "I'm going to kill you, you bastard." Defendant and Cline proceeded to struggle, both men apparently attempting to control the knife. At one point in the struggle, the fighting stopped while defendant exchanged words with his wife. Nancy Sprague testified that at the time of the lull in the fighting, approximately four feet separated the two adversaries and that defendant, though right-handed, now held the knife in his left hand. She also testified that the fighting resumed when Cline took a step toward defendant. However, defendant contended at trial that at the time of the lull, Cline walked a considerable distance away and then returned and suddenly "was right into it, right in my [defendant's] face." In any event, almost immediately after the temporary lull in the fighting, Cline received a fatal knife wound.

## I. Application of Hearsay Exception for Dying Declaration

■ Peter McManus, defendant's father-in-law, and Rodney Moody, a rescue worker, testified that following the stabbing Cline identified Henry Sprague as his assailant. The issue is whether this testimony was properly admitted over defendant's objection that the foundational requirements for the dying declaration exception to the hearsay rule had not been met.

Rule 804(b)(2), M.R.Evid., provides two requirements for the application of the "dying declaration" exception: (1) the declar-

ant must have made the statement "while believing that his death was imminent"[2] and (2) the statement must concern "the cause or circumstances of what he believed to be his impending death."[3] The presiding justice must admit the contested evidence "[i]f he is satisfied that there is credible evidence which if believed would permit but not compel the jury to find" these preliminary facts "proven beyond a reasonable doubt . . . ." *State v. Chaplin*, Me., 286 A.2d 325, 332 (1972).

It is undisputed that the content of the admitted statements satisfied the second requirement. Instead, defendant argues that the State failed to establish the first preliminary fact because (1) Rodney Moody could not recall whether Cline had stated that he was going to die and (2) Cline did not dispute Moody's verbal assurance that the wound would not prove fatal.

We reject each contention. Under direct questioning by the presiding justice, Rodney Moody testified that Cline had said, "I'm going to die" and "I feel like I'm going to die."[4] The fact that Cline also asked, "Am I going to die?" does not detract from the force of his other statements directly reflecting a belief that death was imminent. Further, even apart from the victim's state-

ments to Moody, the State submitted sufficient evidence to meet the foundational requirement. Nancy Sprague testified that immediately after the stabbing, Cline pleaded: "This is for real. I'm going to die. Help me." In addition, both defendant's sister and her boyfriend reported hearing Cline state that he thought he was going to die.

Finally, although this court has previously acknowledged that "[t]he hope of recovery, completely absent on one occasion, may . . . be later renewed by . . . the assurances offered by doctors and nurses," *id.* at 331, defendant presents no evidence that the rescue worker's verbal assurance did, in fact, revive Cline's hope for survival. As the Supreme Court of North Carolina noted in rejecting a similar challenge to the application of the dying declaration exception, *State v. Brown*, 263 N.C. 327, 139 S.E.2d 609 (1965), a verbal statement of comfort and assurance from an attending physician and even a subsequent statement by the victim that "she did not know if she was going to make it or not . . . do not amount to a subsequent change of her consciousness of the certainty of imminent death by the recurrence of a hope of life." *Id.* at 335, 139 S.E.2d at 614. In short, the presiding justice did not err in

2. In *State v. Bordeleau*, 118 Me. 424, 426, 108 A. 464, 465 (1920), this court elaborated upon the degree of belief of impending death necessary to satisfy the foundational requirement:

"[I]t must appear to the presiding justice that at the time of making the statements, the deceased must be conscious of the certainty of approaching speedy death; if any hope of recovery remains, the declarations are inadmissible; nor is it sufficient that the deceased has only the belief that he may ultimately die of his injuries."

3. Rule 804(b)(2), M.R.Evid., which tracks Rule 804(b)(2) of the Federal Rules of Evidence, provides in full:

"(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . . .

"(2) *Statement under belief of impending death.* A statement made by a declarant while believing that his death was imminent,

concerning the cause or circumstances of what he believed to be his impending death."

4. "THE COURT: Did he say 'I'm dying' or 'I'm going to die'?

"THE WITNESS: I can't say, your Honor. He kept
[Moody] referring to—sometimes it was 'Am I going to die,' 'I'm going to die,' 'I feel like I'm going to die,' you know, it was never the same, and in which order he said those I do not remember. He made several *statements towards* 'I'm going to die,' 'Am I going to die?'

. . . . . . . .

"THE COURT: From what you observed, did you conclude that Mr. Cline believed that his death was imminent?

"THE WITNESS: Did I believe that he was going to die?

"THE COURT: Do you think he believed that he was about to die, that his death was imminent?

"THE WITNESS: Yes, I do."

finding "credible evidence" that could lead the jury to conclude that Cline's belief in his impending death had been proven beyond a reasonable doubt.

## II. *Sufficiency of Evidence of Intent*

■ Former 17–A M.R.S.A. § 202(1)(A) specifically provided the degree of mens rea required to convict defendant of criminal homicide in the second degree:

"1. A person is guilty of a criminal homicide in the 2nd degree if:

"A. He causes the death of another *intending to cause such death, or knowing that death will almost certainly result from his conduct;* . . . ." (Emphasis added)

Defendant claims that he lacked the requisite intent, attributing his harsh and abusive language upon emerging from the trailer to his "educational and cultural background" and an attempt to "bluff or scare" his larger adversary into leaving the property. Further, defendant argues that his threatening gestures were confined to the first struggle with Cline and that following the lull in the fighting, he evinced no desire to harm Cline.

The issue on appeal is whether "in view of all the evidence in the case, including reasonable inferences to be drawn therefrom, the jury was warranted in believing beyond a reasonable doubt" that defendant intended to cause Cline's death or knew that death would almost certainly result from his actions. *State v. Luce*, Me., 384 A.2d 50, 52 (1978). We find ample support in the record for the jury's finding. Nancy Sprague testified that when Cline knocked on her door in the early morning hours of May 7, 1977, she informed defendant that the visitor was someone she had met at a dance the previous evening, although she did not specifically identify Cline. When defendant returned to the trailer that evening and discovered his wife was absent, Cline's pickup truck was parked in front of the trailer. Upon hearing his wife and *Cline* return from their date, Henry Sprague emerged from the trailer, holding a knife and yelling, "I'm going to kill you,

you bastard" and "What are you doing messing with my wife? Get the hell out of here." Further, an investigating officer testified that following the incident, Nancy Sprague approached defendant and "made a statement in [sic] the effect of 'My God, Henry, he's dead. You have killed him'." And, according to the officer, defendant replied, " 'Good'."

Finally, despite defendant's contention that Cline became the aggressor after the brief interlude in the fighting, there is no evidence that defendant manifested an intent to end the battle or retreat from the scene. From the evidence before them, the jury could conclude beyond a reasonable doubt that Henry Sprague intended to kill Cline from the moment he emerged from the trailer until the time of the fatal stabbing.

## III. *Adequacy of Instruction Regarding Self-Defense*

■ The presiding justice refused defendant's request for an instruction that "if an encounter takes place and one is an aggressor and there is a breaking off or a retreat by one of the parties, then the other party can become the aggressor even though the defendant may have been the initial aggressor." Instead, the presiding justice instructed the jury as follows:

"It is important in considering all of these instructions that you bear in mind the critical time with respect to this encounter, and the critical time we are talking about is the time at which the decedent sustained the wound. So if there was a period where they separated and then came back together again, you must consider these questions dealing with self-defense as of the time of the actual encounter which resulted in the infliction of the wound."

Claiming that Cline was the aggressor at the time he sustained the fatal wound, defendant maintains that the jury "upon considering the court's instruction would necessarily have applied the law [regarding self-defense] to the entire incident rather than to only the second encounter."

We disagree. Although perhaps less clear than the instruction as requested, the presiding justice's charge does expressly mention the brief interlude in the fighting and directs the jury to "consider these questions dealing with self-defense as of the time of the actual encounter which resulted in the infliction of the wound." As this court has previously stated, "a specific instruction need not be given in the exact language requested provided the substance thereof is adequately covered otherwise." *State v. Palumbo*, Me., 327 A.2d 613, 616 (1974). We find the presiding justice's instruction sufficient.

### IV. *Application of Defense of Self-Defense to Homicide in the 4th or 5th Degree*

Although the State charged defendant with homicide in the 2nd degree, the presiding justice also instructed the jury in regard to homicide in the 4th degree (recklessness) [5] and homicide in the 5th degree (criminal negligence).[6] In giving these instructions, the presiding justice told the jury that "the defense of self-defense is not available with respect to a charge of 4th or 5th degree homicide." Defendant claims that this instruction constituted "material and reversible error." We do not agree.

■ We do recognize that the presiding justice's instruction did fall short of being a full exposition of the legal rules applicable to evidence tending to prove a defendant was at the time of the alleged criminal offense acting to defend himself. By definition, either fourth or fifth degree homicide assumes that the defendant's killing of the victim was unintentional. The law of self-defense, taken in the ordinary sense, may be raised as a defense to a homicide only where the defendant *intentionally kills* his assailant. *Curry v. State*, 148 Ga. 559, 563, 97 S.E. 529, 530 (1918). Thus, it is often said, as stated by the presiding justice in his jury charge, that the defense of self-defense is not applicable against charges of unintentional homicide. See *State v. Hale*, 371 S.W.2d 249 (Mo.1963); *State v. Leos*, 7 Or.App. 211, 490 P.2d 521 (1971); *Valentine v. Commonwealth*, 187 Va. 946, 48 S.E.2d 264 (1948). *See generally* 40 C.J.S. *Homicide* § 112.

■ On the facts of the case at bar, if the jury found that Sprague had disengaged from the fight during the brief lull and thereafter Cline was the aggressor and threatened Sprague with death or grievous bodily harm, then Sprague could raise the law of self-defense as a justification for an intentional killing of Cline.[7] Indeed, Sprague so argued, and the presiding justice properly instructed the jury in regard to the law of self-defense as it applies to the crime of homicide in the 2nd degree, which is the crime of killing intentionally or with knowledge that death will almost certainly result. See n. 1 above.

Similarly, if Cline was the aggressor, and Sprague, even though not intending to kill Cline, accidentally administered the fatal wound while attempting to defend himself, it cannot be said that his conduct was unlawful. However, defendant could not appeal to the law of self-defense as a justifi-

---

5. Former 17–A M.R.S.A. § 204, repealed by P.L.1977, ch. 510, § 41, effective October 24, 1977, provided in part:

   "1. A person is guilty of criminal homicide in the 4th degree if he:
   "A. Recklessly causes the death of another human being; or
   "B. Causes the death of another human being under circumstances which would otherwise be criminal homicide in the first or 2nd degree except that the actor causes the death while under the influence of extreme mental or emotional disturbance upon adequate provocation."

6. Former 17–A M.R.S.A. § 205, repealed by P.L.1977, ch. 510, § 42, effective October 24, 1977, provided in part:

   "1. A person is guilty of criminal homicide in the 5th degree if, with criminal negligence, he causes the death of another."

7. 17–A M.R.S.A. § 108 (Supp.1978), entitled "Physical force in defense of a person," spells out the circumstances in which a person is "justified in using a reasonable degree of non-deadly force upon another person in order to defend himself or a 3rd person" (see subsection 1) and those other circumstances in which a person is "justified in using deadly force" (see subsection 2).

cation for the homicide. Instead, defendant could invoke the *right* of self-defense in arguing that his act which accidentally resulted in the killing of Cline was not itself unlawful. The distinction between an intentional killing in self-defense and an accidental killing while exercising one's right of self-defense was explained by the Georgia Supreme Court as follows:

"[I]f it be true that the defendant was endeavoring to prevent the deceased from slaying him, or committing upon him a serious personal injury amounting to a felony, he would have the right even to kill the deceased intentionally in order to prevent it. Having the right under such circumstances to kill his assailant, if necessary for his own protection, if in asserting his right of self-defense he attempted to wrest the pistol from his adversary or to turn it aside, in doing which it was accidentally discharged, certainly the defendant could not be charged with any degree of care with respect to the manner in which he handled the pistol. Furthermore, if there was no intent to kill, the law of killing in self-defense, in the ordinary sense in which that is understood, does not enter into the case, since that only applies where the accused intentionally kills his assailant to protect his own life, or to prevent the commission upon him of a serious injury amounting to a felony. On the other hand, *the right he would have under such circumstances intentionally to kill his assailant justifies whatever he may do in exercising his right of self-defense* ; and in the exercise of that right there can be no question of evil design, or intention, or culpable neglect, which could operate to make the accused guilty of a crime." (Emphasis added) *Curry v. State, supra,* 148 Ga. at 562–63, 97 S.E. at 530.

Thus, if the circumstances exist which would justify using deadly force in self-defense, see 17–A M.R.S.A. § 108(2), negligence or recklessness in taking lesser action in self-defense cannot be the foundation for criminal liability for conduct resulting in the death of the assailant.[8]

On the other hand, the recklessness or criminal negligence from which criminal liability for a homicide results may lie in the unreasonableness of the defendant's belief that the requisite circumstances exist to justify his use of deadly force. Under 17–A M.R.S.A. § 108(2) a person is justified in using deadly force upon another person *only* (1) when "he *reasonably* believes it necessary" *and* (2) when "he *reasonably* believes such other person is . . . [a]bout to use unlawful, deadly force against himself or a 3rd person." (Emphasis added) Section 101 of the Criminal Code, in laying down the general rules applicable to the defense of self-defense, declares:

"If a defense provided under this chapter is precluded solely because the requirement that the actor's belief be reasonable has not been met, he may be convicted only of a crime for which recklessness or criminal negligence suffices, depending on whether his holding the belief was reckless or criminally negligent."

We do not mean to say that the trial justice will need to give in his charge to the jury a full exposition of the foregoing law regarding self-defense in every case where the defendant argues that defense. Whether part or all of such exposition should be given in a particular case will depend on whether and how the issue is "generated" by the evidence. *Cf. State v. Thompson,* Me., 370 A.2d 650, 654 (1977). In many cases, charging on the legally refined distinction between the defense of self-defense and the right of self-defense may only serve to confuse the jury.

8. See, however, the proviso of the first sentence of 17–A M.R.S.A. § 101(1), which expressly withholds the blanket defense of self-*defense where a third person* rather than the assailant is killed:

"Conduct which is justifiable under this chapter constitutes a defense to any crime; provided, however, that if a person is justified in using force against another, but he recklessly injures or creates a risk of injury to 3rd persons, the justification afforded by this chapter is unavailable in a prosecution for such recklessness."

In the case at bar, although the presiding justice's instruction was oversimplistic in ruling out self-defense as having any applicability to homicide in the 4th or 5th degree, no reversible error resulted. The jury found defendant Sprague guilty of intentional homicide in the 2nd degree, not unintentional homicide in the 4th or 5th degree. The presiding justice's instruction regarding the law of self-defense as applied to homicide in the 2nd degree was complete and correct. On that instruction, the jury's verdict of guilty, supported by adequate evidence of record, is a conclusive finding of fact that Sprague administered the fatal wound intentionally or knowing that death would almost certainly result and that he did not act in self-defense.

Accordingly, the entry must be:

Appeal denied.

Judgment affirmed.

POMEROY and WERNICK, JJ., did not sit.