STATE of Maine

v.

David WEESE and Dwight Weese.

Supreme Judicial Court of Maine.

Argued Nov. 6, 1980.

Decided Jan. 21, 1981.

David W. Crook, Dist. Atty., J. Michael Talbot (orally), Asst. Dist. Atty., Skowhegan, for plaintiff.

Burton G. Shiro (orally), Ronald L. Bishop, Lawrence T. Potter, Waterville, for defendants.

Before McKUSICK, C.J., and WERNICK, GODFREY, GLASSMAN, ROBERTS and CARTER, JJ.

GODFREY, Justice.

David and Dwight Weese appeal from their convictions for night hunting in violation of 12 M.R.S.A. § 2455.[1] The two defendants, father and son, were found guilty after a consolidated trial by jury in Superior Court, Somerset County. At trial both defendants were represented by the same attorney. The defendants challenge their convictions on three grounds: first, that the judge improperly sustained the State's objection to certain questions regarding the defendants' intent; second, that the judge erred in declining to give defendants' requested instruction that "suspicion, no matter how strong, is not sufficient to sustain a conviction;" and third, that there was insufficient evidence to support defendants'

convictions. We affirm the judgment against the father, David Weese. We vacate the judgment against the son, Dwight Weese, for reasons other than those asserted by the defendants.

At about 8:45 in the evening of September 17, 1979, two law enforcement officers were stationed behind a grove of pines off the Dolan Road in Solon, Maine. One officer was Dennis McIntosh, District Game Warden; the other was Sergeant Larry Cummings of the Maine Department of Inland Fisheries and Wildlife. The officers were staking out a field frequented by both deer and night hunters.

Soon an automobile moved slowly off the Dolan Road on an abandoned driveway which led through the field. The vehicle climbed a short rise, stopped, and turned so that its headlights swept the field. Then the automobile swung back to its original position, the headlights again sweeping the field. Finally the car backed slowly down the driveway and resumed traveling down the Dolan Road.

The erratic movements of the automobile caused McIntosh and Cummings to suspect that the vehicle contained night hunters searching for deer. The officers entered their patrol car and followed the suspected vehicle for a short distance without showing their headlights. When the officers activated the blue lights, the other automobile drove on for a few hundred feet and then stopped.

McIntosh and Cummings ran to the other vehicle and discovered four members of the David Weese family in it. In the front passenger's seat was defendant David Weese; at the wheel was Dwight Weese,

1. Defendants were convicted under 12 M.R.S.A. § 2455, as last amended by P.L. 1977, ch. 503, § 20, providing in pertinent part as follows:

It shall be unlawful to hunt wild animals from ½ hour after sunset until ½ hour before sunrise of the following morning except raccoons. . . .

. . . Any person convicted of a violation under this section . . . shall be punished by a fine of not less than $500 nor more than

$1,000 and by imprisonment of not less than 3 nor more than 5 days for the first offense. . . . No punishment under this section shall be suspended. . . .

Effective December 31, 1979, 12 M.R.S.A. § 2455 was repealed and replaced by P.L. 1979, ch. 420, as amended by P.L. 1979, ch. 543. Night hunting is now prohibited by 12 M.R.S.A. § 7406(5) (1974 1980 Supp.). Penalties for violation are provided for in 12 M.R.S.A. § 7901(2) (1974-1980 Supp.).

David's fourteen-year-old son.[2] Seated in the back were David's younger sons, Duane and Daniel. Warden McIntosh testified that when he asked David Weese what he was looking for in the field, David replied that he was just seeing if any deer were there but was not going to kill any. Lying next to David Weese in the automobile was a large caliber hunting rifle with a mounted target scope. The chamber was open. Seeing the rifle, McIntosh arrested David Weese for night hunting. Upon searching the car in the immediate area of the front seat, Sergeant Cummings found a live rifle shell lying on the floor were David Weese's feet would have been.

On October 2, 1979, a complaint for night hunting was issued against David Weese, followed eight days later by another complaint against his son, Dwight. On April 30, 1980, five days before trial, on motion by the State, the trial justice ordered joinder of the two defendants for trial. The order of joinder recited that it had been issued after hearing, but the record is silent as to any argument of counsel concerning the propriety of joinder.

At trial, defendant David Weese declined to take the stand. The only testimony was that of the arresting officers, Dwight Weese, and his younger brothers, Duane and Daniel. The gist of the boys' testimony was that they were all driving to visit their uncle a few miles away when Dwight, who did not yet have a driver's license or learner's permit, persuaded his father to let him operate the car for a while; that they used the Dolan Road as a seldom-used route on which Dwight could safely practice driving; that they turned off Dolan Road on the driveway over the field but found it too rough to continue; and that, after backing out of the field, they had traveled slowly along Dolan Road because it was rough. While defense counsel was conducting a direct examination of Dwight Weese, the following interchange occurred:

[Defense Counsel]: All right. Now did you or your father or even the other two boys who were with you, did they in any way, either of you, intend to hunt any animals?

[Prosecutor]: I object, your Honor.

THE COURT: Sustained. Very leading
. . . .

[Defense Counsel]: Well I would simply ask him if he had a yes or no answer to that, your Honor.

THE COURT: That's the whole point of the leading questions. Rephrase it, please.

BY [Defense Counsel]:

Q. Well, when you went into, on this road, this Dolan Road, was there intent on your part to hunt?

[Prosecutor]: I object, your Honor.

THE COURT: Same ruling. Sustained.

[Defense Counsel]: Side bar, please.

.     .     .     .     .

[Defense Counsel]: I think that one of the important—of course probably the very key issues in the case is whether any one of these persons had any intent to hunt.

THE COURT: Right.

[Defense Counsel]: And the question that I asked him, did he have any intent to hunt, I don't think that is suggesting anything to him in any way.

.     .     .     .     .

THE COURT: I think the appropriate question was, what was your intent? And then he will tell us. I think quite frankly that you are suggesting the answer to him. You can ask what his intention was, but both of the questions you previously asked were very leading and they are on the ultimate issue in this case, and I think certainly on direct it could be brought out in other kinds of questions.

After rephrasing his questions, defense counsel succeeded in eliciting testimony concerning the defendants' intent. Similar objections and rulings were made when Dwight's younger brothers testified.

The Weeses contend that defense counsel's questions were not leading because they did not suggest to the witness the

---

**2.** Dwight was fifteen years old at the time of trial.

desired response. Since those questions sought testimony concerning the defendants' intent—a crucial issue in the case—the defendants assert that the judge committed prejudicial error in sustaining the State's objections. In contrast, the State regards the questions as plainly encouraging an exculpatory answer. Even if the judge did commit error, the State argues, the error was harmless because defense counsel ultimately obtained the testimony he was seeking.

We agree with the State that the defendants sustained no prejudice from the court's rulings in this matter. By redirecting his inquiry, defense counsel ultimately enabled Dwight and his brothers to testify to the defendants' intent, and we cannot find that the defendants were harmed as a result of the fact that their testimony about the family's intent was evoked by a less direct line of questioning. However, the reasons stated by the trial court for upholding the State's objection may reflect some misapprehension about the nature of leading questions. Even though a question concerns a critical issue, it is not objectionably leading merely because it calls for the witness to respond with a simple "yes" or "no."

On direct examination of a friendly witness, a question is objectionably leading when it encourages the witness to adopt as his answer an assertion implicit in the question rather than to state the witness's own recollection. *See Towle v. Aube*, Me., 310 A.2d 259 (1973).[3] Every question is leading in the sense that it directs the witness's attention to a particular event or topic. An objectionably leading question not only solicits an answer concerning a specific topic but also suggests a desired specific answer in regard to that topic. It is not necessarily improper for counsel to ask his witness a detailed and pointed question that may be answered "yes" or "no." Objectionable leading occurs when the question suggests to the witness the answer that is desired, thereby diminishing the likelihood that the answer will be the truth. *See generally* R. Field & P. Murray, *Maine Evidence* § 611.3 at 155 (1976); 3 J. Wigmore, *Evidence* § 769 at 154–55 (Chadbourne Rev. 1970).[4]

The particular form or phrasing of a question does not necessarily determine whether it is leading. A question may become leading if the interrogator's tone of voice, emphasis on certain words, or nonverbal conduct suggests the desired response. *See* R. Field & P. Murray, *Maine Evidence* § 611.3 (1976).

Here, in the context of the particular courtroom situation, it was within the range of the trial court's discretion to rule that the first question asked by defense counsel was impermissibly leading and to treat counsel's second formulation of the question, though not leading on its face, as tainted by the phrasing used by counsel immediately before in presenting the question in its first formulation. Our concern is with the specific ground given by the trial court for its ruling: namely, that the question called for a "yes" or "no" response and concerned a critical issue in the case. It cannot be said that the rulings themselves were erroneous in view of the wide discretion that the trial court has in making evidentiary rulings.

Next, the Weeses contend that the judge erred in refusing to instruct the jury, as part of his instruction on proof beyond a reasonable doubt, that "suspicion, no matter how strong, is not sufficient to sustain a conviction." Although the proposed instruction is a correct statement of

---

**3.** *See also Parsons v. Huff*, 38 Me. 137, 141 (1854): "The end proposed in extracting testimony, is to obtain the actual recollections of the witness, and not the allegation of another person, adopted by the witness and falsely delivered as his."

**4.** Likewise, a question is objectionable that assumes the truth of facts not in evidence. Such a question is also often categorized as leading, although it differs in its pernicious effect from a question suggestive of a desired specific answer. A question that assumes the truth of facts not in evidence essentially lacks foundation and hence tends to mislead the jury rather than encourage false testimony. *See* 3 J. Wigmore, *Evidence* § 771 (Chadbourne Rev. 1970).

the law, *State v. Caliendo*, 136 Me. 169, 175, 4 A.2d 837, 840 (1939), there was no error in declining to give it. A trial court is not required to give a requested jury instruction, though legally sound, if it has already been covered in other portions of the charge, nor is it necessary to adopt the precise language of the request if the jury has been otherwise properly informed as to the law. *State v. Smith*, Me., 400 A.2d 749, 756 (1979); *State v. Rich*, 395 A.2d 1123, 1133 (1978). *See* H. Glassman, *Maine Practice, Rules of Criminal Procedure* § 30.2 at 232 (1967). In charging the jury, the trial justice gave an adequate explanation of proof beyond a reasonable doubt, and the justice's refusal to give the requested instruction could not have left the jury in any uncertainty about the quantum of proof necessary to convict the defendants.

■ Finally, it is plain from the record on appeal that the circumstantial evidence in this case sufficed to support the jury's finding of guilt. *See, e. g., State v. Hillock*, Me., 384 A.2d 437 (1978); *State v. Pottle*, Me., 384 A.2d 55 (1978); *State v. Cowperthwaite*, Me., 354 A.2d 173 (1976); *State v. Pike*, Me., 306 A.2d 145 (1974); *State v. Vicniere*, 152 Me. 293, 128 A.2d 851 (1957); *State v. Allen*, 151 Me. 486, 121 A.2d 342 (1956).

Although there was enough evidence to support the conviction of both defendants, we must nevertheless vacate the conviction of Dwight Weese and remand his case to Superior Court. In the circumstances here, a conflict between the interests of Dwight and his father required the trial justice to inquire into whether Dwight could be adequately represented by counsel retained by the father to represent both in a joint criminal trial. Because the judge did not make that inquiry, Dwight Weese was not afforded his right under the sixth and fourteenth amendments to the effective assistance of counsel.

■ For a court to permit a single attorney to represent codefendants in a joint criminal trial does not in itself violate the constitutional guarantee of effective assistance of counsel. However, where one of two or more criminal defendants represented by the same attorney raises the issue of a conflict of interest between the defendants, the trial justice must inquire into whether the defendant can be represented effectively by existing counsel; if the judge fails to make such an inquiry, the objecting defendant will be held to have been denied his sixth amendment right to the effective assistance of counsel without need for him to show that he was prejudiced by the multiple representation. *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). Although the trial court does not ordinarily have an affirmative duty under the Constitution to institute an inquiry into the propriety of multiple representation when no objection is made before trial, *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), special circumstances may exist in which the court "knows or reasonably should know that a particular conflict exists." *Cuyler v. Sullivan, supra*, 446 U.S. at 347, 100 S.Ct. at 1717, 64 L.Ed.2d at 346 (1980).

■ This case presented special circumstances that should have put the trial judge on notice of a conflict of interest between David and Dwight Weese. The defendants were not both adults dealing at arm's length; they were a father and his young son. They were to be represented in a consolidated trial by one attorney retained by the father. The situation was one in which it could be foreseen in advance of trial that any "unified defense strategy," sometimes hypothecated as a justification for multiple representation,[5] was going to be plainly more advantageous to the father than to the son. Whatever doubt the jury could be expected to have about the intent of the defendants to hunt was more likely to be resolved in favor of a 14-year-old boy acting subject to his father's control than in favor of the father himself. There could be no expectation or hope that the trial judge

---

5. *See* Frankfurter, J., dissenting in *Glasser v. United States*, 315 U.S. 60, 92, 62 S.Ct. 457, 475, 86 L.Ed. 680 (1942): "Joint representation is a means of insuring against reciprocal recrimination. A common defense often gives strength against a common attack."

could suspend the boy's sentence if both defendants were convicted; under the mandatory sentencing provisions of 12 M.R.S.A. § 2455 that were effective in 1979, if the son should be found guilty the judge would have no choice but to sentence him at least to three days in jail and a $500 fine. Thus, when the State moved initially to join the defendants for trial, the interests of the son called for vigorous opposition to joinder. In contrast, from the father's point of view, if the jury were to resolve any doubt about intent to hunt in favor of the son in a joint trial, some benefit to the father's case could be reasonably expected.

As the trial proceeded, the unfairness to Dwight of the dual representation became even more evident. The defendants were not faced with overwhelming direct evidence of their guilt; they were confronted by circumstantial evidence, some of which implicated the father more than the son.[6] When it appeared that the father would not take the stand and that the defense would depend heavily on the testimony of his three sons, the trial justice should have perceived that Dwight Weese might come under great pressure to try to protect his father, quite possibly to the detriment of his own defense.

It is not necessary to delineate in this case the possible range of situations in which the trial judge has a duty to initiate an inquiry into the adequacy of multiple representation in a criminal case.[7] Each case must be decided on its own facts. In the totality of circumstances here, there was a strong possibility that Dwight Weese would not be afforded his constitutional right to the effective assistance of counsel. In view of those circumstances, the trial justice should have investigated whether the young son could be adequately represented in a joint criminal trial by the same attorney who represented his father. Accordingly, as to Dwight Weese, the judgment of conviction must be vacated and the case remanded to Superior Court for further proceedings consistent with this opinion.[8]

The entry is:

Judgment of conviction of David Weese affirmed.

Judgment of conviction of Dwight Weese vacated. Remanded to Superior Court for further proceedings consistent with the opinion herein.

All concurring.

---

6. *E.g.*, the location of the rifle on the passenger side of the car.

7. *See generally* J. Geer, *Representation of Multiple Criminal Defendants: Conflicts of Interest and the Professional Responsibilities of the Defense Attorney*, 62 Minn.L.Rev. 119 (1978); G. Lowenthal, *Joint Representation in Criminal Cases: A Critical Appraisal*, 64 Va.L.Rev. 939 (1978); Comment, *Conflict of Interests in Multiple Representation of Criminal Co-Defendants*, 68 J.Crim.L.C. & P.S. 226 (1977).

8. By so ruling, we do not repudiate our previous holding that a claim of ineffective assistance of counsel is normally inappropriate on appeal and must be reserved for post-conviction habeas corpus relief. *See State v. Gilcott*, Me., 420 A.2d 1238, 1240 (1980). At issue in this case is the judge's failure to make inquiry on the record concerning the adequacy of the defendants' representation. Thus, we have not reviewed the effectiveness of counsel substantively—a determination which usually cannot be made through examination of the record on appeal. Rather, we have scrutinized the record for circumstances giving rise to a judicial duty of inquiry and, having found such circumstances, have examined the record for indications that the necessary inquiry was made.