STATE of Maine

v.

**Louis RANCOURT, II.**

Supreme Judicial Court of Maine.

Argued June 18, 1981.

Decided Oct. 19, 1981.

---

Charles K. Leadbetter, Herbert Bunker, Jr., Frederick C. Moore (orally), Wayne S. Moss, Asst. Attys. Gen., Augusta, for plaintiff.

Daviau, Jabar & Batten, Robert J. Daviau, Joseph Jabar (orally), Waterville, for defendant.

Before McKUSICK, C. J., and WERNICK,* NICHOLS, ROBERTS and CARTER, JJ.

* Wernick, J., sat at oral argument and participated in the initial conference, but retired prior

CARTER, Justice.

Following a three-week jury trial in the Superior Court (Kennebec County), the defendant, Louis Rancourt, II, was convicted of manslaughter. On appeal, the defendant contends that errors were committed in the jury voir dire examination, in evidentiary rulings during the trial, and in the jury instructions. We affirm the judgment below.

The defendant was charged with murder resulting from the May 10, 1980 killing of Stephen Quimby. The state attempted to show that the defendant knew the identity of his victim, and that a possible motive for the killing was the defendant's belief that Quimby was "fooling around" with the defendant's girlfriend, Barbara Caswell. Mindful of the rule that an appellate court must view the evidence and all reasonable inferences therefrom in a light most favorable to the jury verdict, *State v. Goyette*, Me., 407 A.2d 1104, 1107 (1979), we find the trial record discloses the following facts.

On May 3, 1980, while visiting Stephen Quimby at Quimby's home, the defendant told Quimby that if he ever heard of or caught Quimby fooling around with Barbara Caswell, he would shoot him or have someone do it for him.

On May 9, the day before the killing, the defendant left a message for Quimby to come that evening to the defendant's house. Living with the defendant were his girlfriend, Barbara Caswell, his step-brother, Ron Webber, and his step-brother's girlfriend, Chris Dyer. The defendant testified that Quimby would know that the reason for the request was to sell Quimby some marijuana. Quimby received the message the next day, May 10.

Quimby and his nephew, Paul Davidson, spent the 10th drinking and smoking marijuana. Shortly after 9:00 p. m., they went to the defendant's house because Quimby said that he wanted to get some marijuana, and that if the defendant wasn't home he was going to have sex with Barbara Caswell.

to the adoption of this opinion.

At the defendant's house, the defendant and Barbara Caswell were upstairs asleep, while Webber was sleeping downstairs. Dyer was downstairs cleaning. Quimby and Davidson entered the house. Dyer told Quimby that the defendant was upstairs. Quimby then called to the defendant, and began climbing the stairs to the second floor. The defendant and Caswell both yelled at him to get out of the house, but Quimby continued to the defendant's bedroom. The defendant fired one "warning" shot through an outside wall, and then fired a second shot which killed Quimby.

Davidson testified that the defendant called out Quimby's name several times before the killing. Webber heard an argument; Dyer said Quimby was upstairs for a few minutes before he was shot. The defendant testified to the following. He did not know who was climbing the stairs. After the defendant fired the warning shot, the intruder entered the bedroom and grabbed the rifle. They struggled; the ri-

fle discharged. The defendant turned on the light, and first discovered that the intruder was Quimby.

After the shooting, Caswell said to a neighbor: "He shot my boyfriend." The defendant told a policeman: "I did not know who he was. I told him to leave, so I shot him, at a silhouette."

Other facts appear below where relevant to our discussion of the issues.

## I. *Voir Dire*

The defendant argues that the trial court erred by stopping counsel from continuing to ask questions on individual voir dire of prospective jurors.

After the court conducted a general voir dire of the entire jury panel, the court at first permitted counsel to question the individual panel members. Defense counsel's[1] first question recited the facts to which, counsel represented, the defendant would testify.[2] The state objected, and the juror was excused for cause. A conference in the

---

1. The defendant is represented on appeal by different counsel than at trial.

2. Counsel's first question was:

> If you're one of the people selected to be on the jury in this case, to decide the case, you're going to hear evidence that the Defendant, Louis Rancourt, next to me, was at home in bed, in the dark, in his own house at night, last May, when two people broke in intending to steal from him. Their breaking in, running, making noise in doing it, as they approached the door of his house, caused him to wake up. He heard them and yelled to "get out, whoever it is". One of these two that came in to steal went up the stairs. And as the Defendant heard them coming up the stairs, where his bedroom was—two bedrooms in that house on the second floor—it's a small house—he yelled more and more for whoever it was to get away, to get out of here, leave; so did two other people, including one of the people that came in to steal who had stayed downstairs, he yelled to the guy to leave, "get out, please leave". And when Mr. Rancourt was asleep in his bed— he had been living with Barbara Caswell, and she was also asleep; she was also wakened up. It was dark. They had just a small dim light in the living room on, and they were upstairs—they didn't know who it was. But the person kept coming. And Mr. Rancourt had been given a rifle by his father . . . .
>
> . . . . .

> And then the case will involve evidence that this intruding tresspasser [*sic*] was continuing to go up the stairs despite the yells that he go away; that the Defendant had been given a gun by his father; the house is located out in the country where there had been law-breakers, peeping toms, break-ins; and he grabbed the gun to protect himself, and his guest, this uninvited intruder, kept coming and wouldn't go away. He told him he had a gun, and he was going to fire a warning shot so that he knows he means business, and he knows he has to go away. He kept coming, and he fired a warning shot out the opposite wall farthest away, and yet the intruder kept coming. And he was still yelling at him, and the intruder got to within a few feet of the bed and jumped on the Defendant and Miss Caswell. They struggled—the decedent tried to get the gun, which the Defendant, had shot a warning shot from, away from the Defendant, and the decedent grabbed the Defendant, had ahold of him in that struggle. The gun went off; the intruder fell back. Both people in the bedroom then went and got a light on and said "Oh, my God, it's Steve". They were both terribly surprised; it was someone that they knew. And with that background, I would ask if this juror could find if someone was killed under those circumstances there was no criminal liability, or under those circumstances the juror could find the Defendant not guilty on the basis of self-defense, or
>
> . . . .

justice's chambers followed, at which counsel's proposed questions were reviewed and ruled on. Individual questioning by counsel then continued. Defense counsel repeatedly attempted to ask questions which the court had previously ruled in chambers or during earlier voir dire were not permissible. Defense counsel asked repetitious questions, and continued to do so after admonishment by the court. Finally, after completing the questioning of only eight individual jurors, over the span of an afternoon and the following morning, the trial court terminated voir dire by counsel, stating:

> Voir dire questioning has been almost uncontrollable. That is undoubtedly somewhat my fault, but I must say [that defense counsel is] pushing the limit of proper courtroom behavior, and as a result of that, I am not going to permit individual voir dire by counsel of any of the remaining members of the jury panel.

The justice later explained that defense counsel had been asking questions which were "absolutely irrelevant to [one's] qualifications as a juror," and that some of defense counsel's questions "touched on areas that counsel should have known would not be permitted . . . because similar objections had been sustained [previously]." Our review of the record establishes the correctness of these conclusions reached by the trial judge.

The remaining individual voir dire was conducted by the court, counsel being permitted to orally submit proposed questions in advance for each juror.

Relying on 15 M.R.S.A. § 1258–A and M.R.Crim.P. 24(a), the defendant contends that he has an absolute right to address questions to the prospective jurors either himself or through his attorney. Title 15 M.R.S.A. § 1258–A states: "Any rule of court or statute to the contrary notwithstanding, the court shall permit voir dire examination to be conducted by the parties or their attorneys *under its direction*." (Emphasis added.) Under this statute, a trial justice may not arbitrarily refuse to allow counsel to conduct any voir dire examination. However, counsel's right to such examination is limited by the requirement that he or she act under the court's direction. Counsel has no right to conduct voir dire examination outside of the court's direction. M.R.Crim.P. 24(a) provides that the court "shall permit the parties or their attorneys to address additional questions to the prospective jurors on any subject which has not been fully covered in the court's examination and which is germane to the jurors' qualifications." Again, the right of counsel to ask questions is not unlimited. Where counsel demonstrates a generalized inability or an adamant refusal to ask germane question or to act under the court's direction, the trial court may refuse to permit counsel to personally ask further questions. Indeed, it is the trial court's duty to take appropriate steps to control voir dire so that potential jurors are not needlessly and improperly tainted during jury selection procedures.

The defendant does not contend that the trial court erred in any of its rulings on specific questions proposed or asked by counsel during the individual voir dire examination. The record amply supports the court's findings that defense counsel persisted in asking questions irrelevant to the jurors' qualifications, and questions which he should have known would not be permitted because of prior rulings of the court. Counsel's attempts to present to prospective jurors the defendant's expected testimony was improper. The defendant is not entitled to "obtain a pre-judgment by the prospective juror as to what his verdict would be on facts hypothesized by the question." *State v. Abney*, 347 So.2d 498, 501 (La. 1977); *State v. Clark*, 164 Conn. 224, 400, 419 A.2d 398, 399 (1973); *Sweet v. Stutch*, 240 Cal.App. 891, 893, 50 Cal.Rptr. 9, 11 (Dist.Ct.App.1966).

Thus, on this record, it is manifest that the trial judge's actions were necessary to assure the proper conduct of the voir dire function and to guard against the commission of deliberate error in the jury selection process. Defense counsel's continuing and stubborn refusal to abide by simple, clear

rulings of the court in the course of voir dire demonstrated that his conduct was wilful. *See Swanson v. Evans Oil, Inc.*, 12 A.D.2d 875, 209 N.Y.S.2d 860 (1961). Viewed from this perspective, the court's action in taking control of the questioning was not only a necessary but a moderate response to defense counsel's patent attempt to obtain unfair and improper advantage by his conduct of the voir dire examination in total disregard of the trial court's repeated rulings. The trial court's substituted procedure of itself asking the prospective jurors questions proposed by the parties protected the defendant's right to demonstrate prejudice in the array.[3] *See State v. Littlefield*, Me., 374 A.2d 590, 596 (1977). We find no abuse of discretion in the trial court's handling of the voir dire.

## II. *Evidentiary Rulings*

### A. *Expert Testimony*

Dr. Ryan, an expert forensic pathologist, testified that the fatal gunshot wound was not a contact wound. Later, William Manduca, a firearms expert, testified that he found no nitrites on the victim's clothes, and that in his opinion, the gun was at least 2½ feet away from the victim at the time the fatal shot was fired. On cross-examination, Manduca indicated that no nitrites would be found on the victim's clothes if the fatal wound was a contact wound. On redirect, over objection, the state was permitted to ask Manduca:

Q. Did you determine from Dr. Ryan the nature of the wound . . . ?

A. Yes, sir, I did.

. . . . .

Q. Was it a contact wound?

A. No, sir, it wasn't.

The defendant argues that in the above testimony Manduca, a firearms expert, was erroneously permitted to give an opinion concerning forensic pathology. Manduca

was not present in the courtroom when Dr. Ryan testified.

M.R.Evid. 703 states:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject, the facts or date need not be admissible in evidence.

M.R.Evid. 705(a) states:

The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

The Advisers' Note to Rule 705(a) states: "The provision that prior disclosure of the underlying facts is not required does not mean that the expert is forbidden to disclose them on direct examination."

■ Here, Manduca's testimony on redirect examination disclosed underlying data upon which his opinion that the gun was fired at least 2½ feet from the victim was based. His testimony would have been admissible on direct examination; we see no reason why it should not be permitted upon redirect examination. Thus, the defendant's contention that Manduca was permitted to express an expert opinion concerning forensic pathology must fail.

While the defendant does not raise the issue, we note that Manduca's testimony of what Manduca determined from Dr. Ryan was hearsay. The testimony would be admissible under M.R.Evid. 703 only if Dr. Ryan's expert opinion was "of a type reasonably relied upon by experts" in the field of firearms in forming opinions. The reasonableness of the reliance is a preliminary

---

3. The contention that refusal to allow the parties to personally address voir dire examination to prospective jurors violates the United States Constitution has been characterized as "frivolous." *United States v. Duke*, 409 F.2d 669,

671 (4th Cir. 1969) *cert. denied* 397 U.S. 1062, 90 S.Ct. 1497, 25 L.Ed.2d 683; *see United States v. Anderson*, 433 F.2d 856, 858 (8th Cir. 1970).

question for the trial court. " 'It is not enough [for the expert] to show that he relies upon such material only in preparing for litigation; he must establish that experts would act upon it for purposes other than testifying in a lawsuit. The use must be reasonable in the context of a fair administration of the judicial system.' " *State v. Rolls,* Me., 389 A.2d 824, 829–30 (1978) *quoting* Field and Murray, *Maine Evidence* § 703.2 (1976).

■ We need not decide those issues, however, for if error occurred, it was harmless. Dr. Ryan testified prior to Manduca. Dr. Ryan explained the basis for his expert opinion that the fatal wound was not a contact wound, enabling the jury to evaluate that opinion. If the jury had rejected it, they would have known also to discount Manduca's opinion which was based in part upon it.[4]

### B. *Defendant's State of Mind Testimony*

The defendant testified that after being awakened by footsteps on the stairs, he yelled several times at the intruder to get out, jumped out of bed, grabbed a gun and fired a warning shot through the bedroom's outside wall. When the footsteps continued, the defendant quickly moved to the foot of the bed. As he turned around, someone grabbed the gun. They struggled for a few seconds, the defendant broke the intruder's hold on the gun, and it discharged.

The defendant was asked the following questions on direct examination:

Q. Did you have any idea in your mind as to who that person was at that point [after the first shot and after the defendant moved to the foot of the bed]?

A. No.

Q. How did you feel?

4. Moreover, it is clear from M.R.Evid. 703 that if Manduca had heard Dr. Ryan testify *in the courtroom,* then he could have based his opinion upon Dr. Ryan's testimony. *See* Advisers' Note to Rule 703. Where Manduca relied upon

A. I felt that it must be somebody crazy seeing I gave the warning shot and [he] continued to disregard it.

. . . . .

Q. When you felt someone grab your gun, what was your reaction in your mind?
[THE PROSECUTOR] Objection.
[THE COURT] Sustained.

Q. What were you thinking about when that happened?
[THE PROSECUTOR] Objection.
[THE COURT] Same ruling.

. . . . .

Q. Were you afraid of anything at that point [while struggling with the intruder for the gun]?

A. Yes, I was afraid the rifle would go off.

Q. What were you afraid that that might do?

A. Either hit somebody downstairs or Barbara or myself.

Q. What were you afraid might make the gun go off?

A. Sudden movement.

. . . . .

Q. In your mind, did you feel you were in any danger?
[THE PROSECUTOR] Objection.
[THE COURT] Sustained.

Q. What was your thought in your mind as this person—
[THE PROSECUTOR] Objection.
—got to the top of the stairs?
[THE COURT] Sustained.

Q. Would you answer that question?
[THE COURT] No, don't answer the question.

Q. Do you remember any thoughts you had in mind—
[THE PROSECUTOR] Objection.
—when that person got in the second floor of your house?

the very opinion which Dr. Ryan expressed in his testimony, the defendant could not have been unfairly prejudiced by Manduca's testimony.

[THE COURT] [Sustained.]

The defendant argues that these five questions to which objections were sustained were relevant to show the defendant's belief that deadly force was about to be used against him or a third person, and thus that he was justified in using deadly force. *See* 17–A M.R.S.A. § 108(2)(A)(1).

 We agree that the defendant should have been allowed to testify as to his thoughts at the time the intruder allegedly grabbed the gun (first two excluded questions above). However, the defendant in fact was later allowed to so testify, stating that while struggling for the gun he feared the rifle would go off and hit somebody. Thus, the defendant was not prejudiced by the court's exclusion of the answers to the first two questions. *State v. Weese*, Me., 424 A.2d 705, 709 (1981).

 The trial court did not abuse its discretion by excluding the answer to the third question ("In your mind, did you feel you were in any danger?") as a leading question. M.R.Evid. 611(c); *Weese*, 424 A.2d at 709. The trial court was also within its discretion in excluding the two reformulations of that question "as tainted by the phrasing used by counsel immediately before in presenting the question in its first formulation." *Id.* Furthermore, the defendant had previously described his feelings at the time that he had moved to the foot of the bed, which by the defendant's own testimony would have been about the same time that the victim reached the top of the stairs. Thus, it was within the trial court's discretion to exclude the answers to the last questions as cumulative. *See* M.R. Evid. 611(a).

C. *Rebuttal Testimony*

The defendant, on *cross-examination*, testified that he did not recall that on May 9 he either met Mike Mullen, or heard Barbara Caswell call out to someone "Call my mother, he just beat me up." He also testified that while he may have argued with Barbara during the week before the shooting, they did not fight.

Barbara Caswell, on *cross-examination*, testified that on May 4th, in a discussion about sex, she did not say "Well, I got some last night, but it wasn't from Louis."

In rebuttal, the state called Mike Mullen, who testified that on May 9th he saw the defendant and Barbara. Barbara was upset, and asked Mullen to call her mother.

The state also called Diane Burwood, who testified without objection that Barbara, on May 4th, "said she got it the night before, but it wasn't from Louis, or Chris said she thought she heard she said it wasn't from Louis."

The defendant argues, for the first time on appeal, that the rebuttal testimony of both witnesses is irrelevant, and that Burwood's testimony of what Chris said is inadmissible hearsay.

 "Unsaved" errors can be grounds for reversal only if they are obvious errors which affect the defendant's substantial rights. *See* M.R.Crim.P. 52(b); *State v. DiPietro*, Me., 420 A.2d 1233, 1235 (1980).

The state argues that the rebuttal evidence impeached the credibility of the defendant and of Barbara Caswell. Mullen's testimony does not contradict any significant aspect of the defendant's testimony. The defendant conceded that he and Caswell may have argued during the week before the shooting; Mullen merely witnessed the end of one argument.

 Moreover, a witness cannot be cross-examined on collateral matters for the purpose of subsequently contradicting and impeaching his or her testimony in relation to such collateral matters. *State v. Bunker*, Me., 351 A.2d 841, 843 (1976). Recognizing that rule, the state contends that the rebuttal testimony tended to show that the defendant suspected Caswell of having an affair with the victim. Mullen testified that he heard Caswell and the defendant arguing on May 9. It would be pure speculation to assume that the argument centered on the defendant's alleged suspicions concerning Caswell and the victim. As for Burwood's testimony, her recital of what "Chris said she thought she heard [Caswell say]"

was inadmissible hearsay. Thus, upon proper objection, the trial court might have excluded all the rebuttal testimony here in question.

We perceive no obvious error affecting substantial rights, however. Since Mullen's testimony did not substantially contradict the defendant's testimony, there is no significant danger that the defendant's credibility was damaged. The defendant argues that he was prejudiced in that the jury was more likely to believe that the defendant had a motive to kill the victim, *i. e.*, his girlfriend's alleged infidelity with the victim. But evidence of that motive could be prejudicial only if the jury believed that the defendant knew whom he was shooting, and that the defendant shot the victim because of that motive. If the jury so believed, applying the court's instructions, it would have convicted the defendant of murder.[5] Because the defendant was found guilty of manslaughter, such prejudice did not occur. *Cf. State v. Johnson*, Me., 434 A.2d 532, 539 (1981).

In addition, assuming that the rebuttal testimony was prejudicial in the manner above argued by the defendant, there was other evidence of the defendant's suspicions. For example, Quimby's niece testified that on May 3 the defendant threatened to shoot Quimby if he heard that Quimby was fooling around with Caswell. Thus, the rebuttal testimony was at most cumulative. *Cf. State v. Hassapelis*, Me., 404 A.2d 232, 238 (1979).

## D. *Surrebuttal Testimony*

▇▇▇ In surrebuttal, the defendant presented two witnesses. The trial court excluded, upon objection as hearsay, Thelma Maxwell's testimony that Barbara Caswell had said "no" to requests for dates from Maxwell's son. The defendant argues that that evidence would tend to disprove the rebuttal evidence which insinuated that Caswell was unfaithful to Louis. The trial

court's ruling was correct. Moreover, the defendant had earlier elicited this same testimony on cross-examination of Diane Burwood. "Thus, the proffered testimony, even if appropriate rebuttal, would have been cumulative. Where the rebuttal evidence is cumulative, the judge in his discretion may exclude it." *Payson v. Bombardier, Ltd.*, Me., 435 A.2d 411, 414 (1981) [Decision No. 2743; slip op. at 6].

▇▇▇ The trial court also excluded, upon objection, evidence that Barbara Caswell had not had sex with anyone on May 3. The defendant argues that the evidence would tend to disprove the rebuttal evidence that Caswell had said on May 4: "I got some last night, but it wasn't from Louis." The trial court ruled that the excluded evidence was irrelevant: "the question is whether or not [Caswell said it], not whether or not it was true." We agree. The rebuttal evidence of Caswell's statement was admitted as a prior inconsistent statement to be used to impeach Caswell's credibility. The jury was instructed to use prior inconsistent statements of witnesses not made under oath only for impeachment purposes. Thus, the issue on surrebuttal was indeed what Caswell *said* on May 4, not what Caswell *did* on May 3.

## E. *Evidence of the Victim's Intentions*

The trial court admitted, over the defendant's objection, the following testimony of Stephen Quimby's nephew:

Q. Did Steve [the victim] say why he wanted to go up there [to defendant's house on May 10th]?

A. He said he wanted to get some marijuana, and if Louis wasn't there he was going to get a piece of ass off from Barb[ara Caswell].

The defendant argues (1) that this evidence is inadmissible hearsay, and (2) that its prejudicial effect outweighs its probative value, since it was the first mention at trial of marijuana.

---

5. The jury was *not* instructed to reduce murder to manslaughter if it found that the defendant acted "under the influence of extreme anger or extreme fear brought about by adequate provo-

cation." 17–A M.R.S.A. § 203(1)(B). The defendant does not contend that this instruction should have been given.

■ As to the first ground of objection, this evidence of Quimby's present intention to do a future act is within the "present mental state" exception to the hearsay rule. M.R.Evid. 803(3); *State v. Cugliata*, Me., 372 A.2d 1019, 1027 (1977). There are here "circumstances precluding a suspicion of misrepresentation" on the part of Quimby in addition to the indicia of reliability inherent in any assertion of present mental condition. *Mutual Life Insurance Co. v. Hillmon*, 145 U.S. 285, 295, 12 S.Ct. 909, 912, 36 L.Ed. 706 (1892); *see Cugliata*, 372 A.2d at 1027–28. The possession of usable amounts of marijuana was a civil violation (22 M.R.S.A. § 2383); it was unlikely that Quimby would fabricate himself into civil liability. The statement was made within an hour of Quimby's arrival at the defendant's home, thus reducing the probability that Quimby would change his mind and not act in accordance with his stated intentions.

■ With respect to the defendant's second ground for exclusion of this evidence, the testimony was relevant; it weighed against the defendant's testimony that an intruder entered the defendant's bedroom without identifying himself and attempted to seize the defendant's gun away from him. The trial court found that the potential prejudicial impact of the testimony was "minimal," and thus found impliedly that its probative value was not substantially outweighed by the danger of unfair prejudice. *See* M.R.Evid. 403. We find no abuse of the trial court's discretion in that determination. *See State v. Lagasse*, Me., 410 A.2d 537, 541 (1980).

### III. *Jury Instructions*

The defendant argues, for the first time on appeal, that the jury instructions concerning justification were in error. "Hence, if there was error in the charge, it is cognizable on appeal only if it was a seriously prejudicial error tending to produce manifest injustice." *State v. Baker*, Me., 409 A.2d 216, 219 (1979); M.R.Crim.P. 30(b) and 52(b).

The trial court instructed the jury first to decide whether the defendant acted intentionally, knowingly, recklessly or with criminal negligence in causing the victim's death. The court defined those four terms. It then explained the three justification defenses available: 17–A M.R.S.A. §§ 104(3)(B), 108(2)(A)(1), 108(2)(B).[6] In doing so, the court instructed the jury to make a two-step determination in deciding whether the defendant had the various required "reasonable beliefs": 1) "You must determine whether the defendant honestly and actually believed that a particular circumstance or circumstances existed"; 2) If yes, then would "a reasonable prudent person[7] in the same situation as the defendant ... have held the belief."

6. Section 104(3)(B) states:

 3. A person in possession or control of a dwelling place ... is justified in using deadly force upon another:

 . . . . .

 B. When he reasonably believes that deadly force is necessary to prevent or terminate the commission of a criminal trespass by such other person, who he reasonably believes:
 (1) Has entered or is attempting to enter the dwelling place or has surreptitiously remained within the dwelling place without a license or privilege to do so; and
 (2) Is committing or is likely to commit some other crime within the dwelling place.
 Section 108(2)(A)(1) and 108(2)(B) state:
 2. A person is justified in using deadly force upon another person:
 A. When he reasonably believes it necessary and he reasonably believes such other person is:

 (1) About to use unlawful, deadly force against himself or a 3rd person;

 . . . . .

 B. When he reasonably believes:
 (1) That such other person has entered or is attempting to enter a dwelling ...; and
 (2) That deadly force is necessary to prevent the infliction of bodily injury by such other person upon himself or a 3rd person present in the dwelling place....

7. The jury asked to hear the justification instructions a second time. Upon repeating them, the trial judge amended this instruction to ask if a "reasonable prudent and sober person" in the same situation would have held the belief. The defendant objected to use of the word "sober."

We find no error in the instruction. There was evidence that the defendant had been voluntarily drinking intoxicating beverages during

Then, in accordance with 17–A M.R.S.A. § 101(1),[8] the jury was told that regardless of whether the defendant caused the death intentionally, knowingly, recklessly or with criminal negligence, if the jury found "that the sole reason that [the defendant's] conduct was not justified is because the belief in certain facts [was] not reasonable, you must now consider whether the holding of those beliefs was either reckless or criminally negligent.[9] If you so find, the defendant is guilty of manslaughter."

The court summarized this process as follows:

So, what do you do in terms of substance in the case? Determine whether the State has proved beyond a reasonable doubt (1) whether the defendant intentionally or knowingly caused the death of Stephen Quimby. If not, consider second, whether he recklessly or with criminal negligence caused the death of Stephen Quimby. If neither, the verdict is not guilty, if the State proves neither.

If either, you then look to see if the conduct was justified. If you find it not justified, as I've described it to you, then you look to see if the conduct was partially justified by an honest, though unreasonable, belief, recklessly or criminally negligently held.

If the conduct was justified, the verdict is not guilty. If the conduct was partially justified, the verdict is manslaughter. If the conduct was wholly unjustified, it would be either murder or manslaughter depending on your initial determination as to intentionally and knowingly as opposed to recklessly or criminally negligent.

■ The defendant argues that the second step above (determining whether a reasonable person in the same situation as the defendant would have held the belief) was an unnecessary step apt to confuse the jury. The defendant contends that if the jury found that the defendant honestly and actually believed that particular circum-

---

the day of May 10. Thus, the jury might well question whether a reasonable man "in the *same situation* as the defendant" meant a reasonable sober man, or a reasonable man who had been drinking as the defendant had during the day. "At least where his intoxication is voluntary, ... the defendant [is required to] appraise the situation as would a reasonable *sober* man." LaFave and Scott, *Criminal Law* § 45, at 347 (1972) (emphasis in original); *see also* 17–A M.R.S.A. § 58–A(2) (self-induced intoxication no defense to crime where culpable mental state is recklessness).

8. Section 101(1) states:
 1. Conduct which is justifiable under this chapter constitutes a defense to any crime; provided, however, that if a person is justified in using force against another, but he recklessly injures or creates a risk of injury to 3rd persons, the justification afforded by this chapter is unavailable in a prosecution for such recklessness. If a defense provided under this chapter is precluded solely because the requirement that the actor's belief be reasonable has not been met, he may be convicted only of a crime for which recklessness or criminal negligence suffices, depending on whether his holding the belief was reckless or criminally negligent.

9. 17–A M.R.S.A. §§ 10(3) and (4) state:
 § 10. Definitions of culpable states of mind
 . . . . .
 3. "Recklessly."

A. A person acts recklessly with respect to a result of his conduct when he consciously disregards a risk that his conduct will cause such a result.
B. A person acts recklessly with respect to attendant circumstances when he consciously disregards a risk that such circumstances exist.
C. For purposes of this subsection, the disregard of the risk, when viewed in light of the nature and purpose of the person's conduct and the circumstances known to him, must involve a gross deviation from the standard of conduct that a reasonable and prudent person would observe in the same situation.
4. "Criminal negligence."
A. A person acts with criminal negligence with respect to a result of his conduct when he fails to be aware of a risk that his conduct will cause such a result.
B. A person acts with criminal negligence with respect to attendant circumstances when he fails to be aware of a risk that such circumstances exist.
C. For purposes of this subsection, the failure to be aware of the risk, when viewed in light of the nature and purpose of the person's conduct and the circumstances known to him, must involve a gross deviation from the standard of conduct that a reasonable and prudent person would observe in the same situation.

stances existed, then the jury should have merely been instructed to determine whether the holding of that belief was criminally negligent or reckless. We agree that this second step was unnecessary, but we find no prejudice accruing to the defendant by its inclusion. As the defendant himself concedes, the court's instructions accurately stated the law.

Somewhat more troubling is the trial court's failure to *explicitly* instruct the jury that the defendant should have been acquitted if the jury found: 1) that the defendant honestly and actually believed that circumstances sufficient to justify his conduct existed; 2) that a reasonable prudent person in the same situation would *not* have held that belief; but 3) that holding the belief was not "a gross deviation from the standard of conduct that a reasonable and prudent person would observe in the same situation," [10] *i. e.*, the defendant's holding of the belief was neither reckless nor criminally negligent.

Read as a whole, the instructions do imply that the defendant would not be guilty of manslaughter in the just-described circumstances. The jury was instructed that if "the sole reason that [the defendant's] conduct was not justified is because [he held an unreasonable belief in certain facts, then] you must now consider whether the holding of those beliefs was either reckless or criminally negligent. If you so find, the defendant is guilty of manslaughter." It plainly follows from that instruction that if the jury did not "so find," then the defendant would not be guilty of manslaughter. Even assuming that the jury mistakenly believed that the proper verdict under those circumstances would be to convict the defendant of murder, this defendant was convicted of manslaughter. Thus, he could not have been prejudiced by such a mistake. *Cf. State v. Sprague*, Me., 394 A.2d 253, 259 (1978). We find no seriously prejudicial error tending to produce manifest injustice.

The entry is:

Judgment affirmed.

All concurring.

10. 17–A M.R.S.A. §§ 10(3)(C) and 4(C); see note 9 *supra*.