STATE OF MAINE
*vs.*
ANTHONY CASALE

Cumberland.    Opinion, December 1, 1954.

*Alexander A. LaFleur, Attorney General,*
*Neal A. Donahue, Asst. Attorney General,* for State.

*Stanley L. Bird,* for defendant.

SITTING:    WILLIAMSON, TIRRELL, WEBBER, BELIVEAU, JJ.
THAXTER, A.R.J., does not concur.    FELLOWS, C. J., and
TAPLEY, J., did not sit.

BELIVEAU, J.    On motion for new trial.    The respondent
was indicted at the September 1951 Term of the Superior

Court for Cumberland County on a charge of transporting one Marilyn Sargent "with intent and purpose to induce and entice the said female to become a prostitute."

The respondent was put on trial at the January Term 1952 and convicted. Marilyn Sargent Morris testified for the State that on January 3 or 4, 1951, she was transported by the respondent to Melody Ranch at Old Orchard to a house of prostitution and there held a prisoner. Until she escaped she was engaged in prostitution with men brought to her room by the operator of the establishment. The case was submitted to the jury on the State's evidence and no defense offered. Several exceptions were taken during the trial.

At the same term of court a motion for a new trial on the grounds of newly discovered evidence was filed by the respondent. Testimony on this motion was taken at Portland April 28, 1952. The exceptions and motion for a new trial were argued before this court and both overruled. *State* v. *Casale,* 148 Me. 312, 92A Sec. Series 718.

The court in that opinion said:

> "the tests to be applied to this motion for a new trial, on grounds of newly discovered evidence are: (1) that the evidence is such as will probably change the result if a new trial is granted. (2) that it has been discovered since the trial, (3) that it could not have been discovered before the trial by the exercise of due diligence, (4) that it is material to the issue, and (5) that it is not merely cumulative or impeaching, unless it is clear that such impeachment would have resulted in a different verdict."

The court discussed, in detail, evidence offered in support of the motion and decided that, first, it did not deny the charge in the indictment, and second, that much of the evidence, if not all of it, would be admissible only within the discretion of a presiding justice and that this evidence was

known to the respondent before the trial, or could have been found by the exercise of reasonable diligence.

It was further ruled that no injustice was done at the trial and no injustice would be done by the denial of the motion for a new trial.

Another motion for a new trial on grounds of newly discovered evidence was filed February 10, 1954. Testimony in support of this motion was taken at Portland on March 29, 30, 31, 1954, again on July 12 and 13 of the same year, and is now before this court for decision.

Much of the evidence heard on this last motion was largely repetition of the old script with additional actors. It was cumulative to that given on the first motion for a new trial.

Our court in *State* v. *Casale, supra,* in discussing similar evidence ruled it did not stand the legal tests applicable. This ruling applies with equal force to the evidence taken on this motion, which for the most part, has for its purpose an attempt to furnish an alibi for the respondent. Other testimony, heard on this motion for a new trial, other than that of Morris and his wife was inadmissible and immaterial.

Tony Casale, the respondent, in his testimony on first motion for a new trial, testified he went to Boston on December 31, 1950 and remained there until he returned to Maine, January 5, 1951. He gave then as his reason for not providing witnesses at the trial, "I didn't bother about it. It was none of my business. I thought maybe the State would not prosecute." He testified he did not offer himself as a witness on the advice of counsel.

On the pending motion, he gave as a reason, "I thought the State would be fair enough to bring their witnesses forward."

It is well known to those familiar with trial work that trial strategy is usually discussed and planned. It goes with-

out saying that much discussion was had between counsel, as to strategy to be followed in the trial, and between counsel and the respondent. It was decided by them that they would offer no testimony in defense and would submit the case to the jury on the evidence produced by the State. If that is so, then the respondent will not be granted his motion for a new trial, so that he may have an opportunity to do now what he should have done at his trial. He cannot complain that the strategy was not successful.

In order for this court to grant the motion it must be satisfied from all the evidence that Marilyn Sargent Morris was not telling the truth when she testified against the respondent in January 1952 and that the recantation has the stamp of truth.

It would appear from the record that she first gave this information to Captain Edward M. Kochian, of the Portland Police, at her home in the spring of 1951. Captain Kochian called there on another matter and while at the house, the husband requested she tell the Captain the whole story about the Casale affair and she is quoted by the Captain as saying, "No, I don't want to go through that. I don't want to repeat anything that went on. I want to forget the whole thing." The husband repeated his request and she finally told Kochian about the episode. As a result she went to the office of the County Attorney the next day, repeated to that official, with others present, what she had told Captain Kochian, the night before and gave a written and signed statement to that effect.

Nothing else was done until she appeared before the Grand Jury in Portland in September 1951, at which term the Grand Jury returned the indictment on which Casale was tried and convicted. She appeared before the Grand Jury at the November 1951 Term of the Superior Court at Alfred and gave the same testimony there. She again gave

like testimony at the trial of the respondent at the January 1952 Term in Portland, as before stated.

The cross-examination of Mrs. Morris, at the respondent's trial, was relentless and gruelling and every device of the cross-examiner was tried to trip the witness. She accused the cross-examiner of "bellowing" at her and gave that as her reason for crying during some of the cross-examination.

It is probably true that the jury, after listening to this kind of cross-examination, was satisfied that Mrs. Morris was telling the truth. As is sometimes the case, the cross-examination, as it appears from the cold record alone, served to emphasize, elaborate and give in greater detail the events involved in the transportation of Mrs. Morris to Melody Ranch. It shows no contradiction and would seem, if anything, to make her testimony more certain, convincing and effective.

The record discloses that Mrs. Morris' direct and redirect testimony covers 16 pages, while the cross-examination and recross covers 73 pages.

Mrs. Morris' testimony, given under oath, prior to September 25, 1953, covering the several occasions she testified, seems consistent.

No hint of any recantation or change in testimony is suggested until sometime after new counsel employed by the respondent had completed his investigation and not until after several interviews with Morris and his wife.

It is admitted by counsel for the respondent, that he was employed in June 1953; that he made a lengthy investigation, which was completed about September 25, 1953, after which time he called on Marilyn Sargent Morris in Lewiston. There he talked with Mr. and Mrs. Morris and told them about the results of his investigation. Apparently, on

that visit, the conversation was between counsel and Morris, the husband. Counsel attempted to convince the husband that his wife had not told the truth when she testified. He went over with Morris, piece by piece, the alleged evidence discovered in Boston but the husband would not be convinced and the suggestion was made that the wife had lied to her husband in order that he might believe she had not gone to Melody Ranch of her own accord. Counsel came back four or five days later and attempted, as he had before, to convince the husband that his wife had lied to him and had done other things which the husband did not know about. After this had been going on for some time, and apparently the husband had not yet been convinced, sexy pictures were mentioned. Morris became angry. His wife ran into the bedroom and he after her. This was the occasion, as testified later by the wife, that she was choked by the husband. He came out of the bedroom and informed counsel his wife had been lying, that he would talk to her and come back in a few days.

The husband came to the office of the attorney for *Casale* in Waterville on March 16, 1954 and inquired if something could not be done to straighten out the case and avoid the necessity of his wife's or his presence at Portland on the 29th of March.

At the same interview the husband suggested the payment, to him, of eight hundred dollars by counsel so they could leave town. Counsel says as to that, "I didn't say yes or I didn't say no."

Within a day or two after this conversation, Morris called at counsel's office in Waterville with an itemized account of these expenses, in the neighborhood of $1200. Counsel knew Morris was coming to his office with the statement and before this meeting withdrew from a bank in Waterville the sum of $1100. When Morris entered his office, $1000 of this money was in plain sight and as Morris entered the office

counsel testified, "I was slowly counting it out as he came into the room." Counsel stated the reason for this display of money was to induce the husband to confess his part in this affair. If such a confession was made, according to counsel, then he planned to give him a manila envelope, made up of dummy packages of newspaper money. Counsel readily admitted there was no question but that Morris dominated his wife absolutely, and that the money on the desk and in full view of Morris was to "whet his appetite" and keep him "on the hook."

The husband again came to the attorney's office on the 18th day of March, presumably after his wife had been summoned to appear at a hearing on March 29. At this conference he wanted something done so she would not again have to testify in court. He suggested that a statement made by his wife, before an attorney, would be sufficient. Counsel advised him to go to a reputable lawyer and have such a statement properly prepared. Counsel was informed that Morris had called an attorney on Saturday morning the twentieth, so that such a statement might be prepared. Counsel phoned this attorney about 11:30 that morning and was told he could not handle the matter. Morris and his wife then went to the office of another attorney to prepare such a statement. Counsel called this last attorney's office at about twelve o'clock noon that day and was informed it would take about an hour to prepare the statement and asked him to call back about one o'clock. Such a call was made and the statement read to counsel over the telephone. Counsel was not satisfied and asked that Mr. and Mrs. Morris be recalled for a more detailed statement. Another statement was obtained and read to counsel over the telephone. This apparently was satisfactory.

Marilyn Sargent, who testified for the State at the trial of the respondent, was the first witness for the petitioner on the pending motion. On direct examination she testified that

Anthony Casale did not take her to Melody Ranch on January 2, 1951 and that she saw the respondent for the first time, two days later, or January 4th of the same year. She admitted on cross-examination that she testified before the Grand Jury at Alfred, York County, at the November 1951 Term that she was taken to Melody Ranch at Old Orchard, by the respondent, as alleged; that she gave the same testimony at the respondent's trial in Portland at the January 1952 Term, and on December 3, 1953 before the Governor and Council on the respondent's petition for a pardon. She admitted making the same statement or accusation in November 1953 in the presence of several law-enforcement officials. Again, on cross-examination, she admitted that before the Governor and Council at the pardon hearing on December 3, 1953, she told of having been threatened by the attorney for Casale and gave as another reason for changing her testimony on October 2 before a Justice of the Superior Court, the physical abuse by her husband.

There was introduced, at this hearing, a report of testimony by this woman before this justice at Auburn, October 2, 1953, when she testified Anthony Casale, the respondent, did not transport her to Melody Ranch from Portland, as testified by her, under oath, on several prior occasions.

At the time the testimony was taken before the justice there was no process or proceeding pending before that court and this presumably was done at the request of counsel for the respondent and for his accommodation. The State was not given the opportunity to take any part in this so-called hearing. At best it can only be treated as an admission by Mrs. Morris that she testified falsely at Casale's trial.

On resumption of the hearing, July 12, 1954, after the petitioner rested, the State called Morris and his wife. She repudiated her testimony exonerating Casale and again testified that he had transported her to Melody Ranch, as

charged by the State. She gave as a reason for testifying otherwise on two or three prior occasions that counsel informed them he was going to reopen the Casale case and to avoid a lot of much bad publicity and discomfort "that the best thing for us would be to make a statement in front of a judge that Mr. Casale did not take me to Melody Ranch."

And again she stated,

"For three years I have lived a life of Hell. I have been bothered continuously by F.B.I. men, private detectives, State Police, State investigators. We have had to move; my husband has lost jobs; I have lost friends; I had a premature baby because of it; I haven't been well because of it; and I was sick and tired of the whole business and wanted to get it over with; and we thought we had found an easy way out; and thinking that the easy way was the best way, I did what I did, but I can see it was wrong, — it was the wrong thing to do, because he did take me to Melody Ranch."

At the time counsel was retained by Casale, there was deposited in a Portland bank, and available to him, the sum of $10,000 which was subject to his order when authorized by defendant's mother.

Money was paid Morris by counsel but there is some controversy as to how much. Morris testified he received several sums of money from counsel—in installments of $50, $17, $20, and $50 when his wife was arrested on a perjury warrant. Counsel testified he paid Morris no more than $60 or $65. In addition to that it is admitted counsel paid the sum of $250 for services in preparing the affidavit, which purported to exonerate Casale, and for the attorney's appearance at the March hearing, on this motion, as counsel for Mrs. Morris.

Morris was an unsavory character and in this situation apparently saw an opportunity to secure for himself some of the money available to counsel for the purpose of secur-

ing Casale's freedom, and it requires little imagination to picture the pressure which Morris exerted on his wife to help Casale.

Counsel on cross-examination testified Morris had a very definite impression he was to be paid some money by counsel and not only did he, counsel, do nothing to change that belief but from the testimony one would gather that this impression on the part of Morris was encouraged. Counsel attempts to justify this conduct as being in his opinion proper procedure in order to arrive at the "truth."

While counsel may have been motivated by the very best of intentions, it must at all times be borne in mind that his employment was to secure Casale's freedom with ample money available to bring about that result.

Unfortunately it has happened, in some cases, that witnesses have been offered money or other inducements to testify to other than the truth, but we are not aware of any situation where witnesses have been paid or offered money to testify truthfully.

We cannot and do not approve the tactics or procedure resorted to by counsel in this case insofar as it concerns his relations with Morris and his wife.

On March 29, 1954, Mrs. Morris voluntarily submitted to a lie detector test conducted by Arthur W. Drew, Jr. This test is, in fact, a series of tests conducted by the examiner. When completed, the results are studied by him, analyzed and evaluated. From that study he then reaches a conclusion.

Such tests have been the subject of much judicial discussion with the result that they have been universally rejected by the courts as evidence to be used in the trial courts.

The Nebraska Supreme Court passing upon this question, cited many authorities in support of its ruling that such

tests are not admissible, and has this to say, after a lengthy discussion of the problem:

> "It is apparent from the foregoing authorities that the scientific principle involved in the use of such polygraph has not yet gone beyond the experimental and reached the demonstrable stage, and that it has not yet received general scientific acceptance. The experimenting psychologists themselves admit that a wholly accurate test is yet to be perfected."

*Boeche* v. *State,* 151 Neb., 368, 37 N. W. (2nd) at Page 597.

The Supreme Court of Florida said that the use of such a test

> ". . . . . . . . resulted, in effect, in the substitution of a mechanical device, without fair opportunity for cross-examination, for the time-tested, time-tried, and time-honored discretion of the judgment of a jury as to matters of credibility."

*Kaminski* v. *State,* 63 So. (2nd) (Fla.) 339 at 341.

We agree with what seems to be the universal opinion of courts called upon to pass upon this question, and rule that such evidence is not admissible.

We are not satisfied that Mrs. Morris committed perjury or falsified her testimony before the several Grand Juries, when single, and at Casale's trial, after her marriage to Morris. There is no testimony in the case to warrant counsel's argument that her purpose was to secure money from Casale. As a matter of fact, from the record, it appears that her story was not changed until after several interviews with counsel, beginning September 1953, and it is probably true that the so-called recantation was made partly for the reasons she gave in her testimony, quoted earlier in this opinion.

Our court has the following to say on recantations:

> " 'It cannot be said as a matter of law that a new trial should be granted whenever an important witness against the defendant shall make an affidavit that he committed perjury in his testimony. If that were so, justice might be defeated in many grave cases.' In a similar vein the New York Court in People v. Shilitano, 218 N.Y., 169, 180, said in substance; Recantation on the part of a witness does not necessarily entitle a respondent to a new trial, otherwise the power to give a convicted person a new trial would rest with the witnesses who testified against him.
>
> Other courts have also recognized the great danger of accepting without rigid scrutiny this kind of evidence, or recantation of testimony given at the trial as sufficient ground for granting a new trial in criminal cases. Lucia v. State, 77 Vt., 279; State v. Blanchard, 88 Minn., 82; People v. McGuire, 2 Hun., 269."

*State* v. *Dodge,* 124 Me. 249.

We find the alleged recantation by Mrs. Morris was made because of improper pressure, promises, threats, and in addition to that, actual violence by Morris, the husband, and is of no value. No injustice will be done by the denial of this motion.

*Motion overruled.*