STATE of Maine

v.

Steve BOWDEN.

Supreme Judicial Court of Maine.

July 22, 1975.

Charles K. Leadbetter, Thomas A. Berry, Asst. Attys. Gen., Augusta, for plaintiff.

Eaton, Glass, Marsano & Hammond by Francis C. Marsano, Belfast, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD, DELAHANTY, JJ.

POMEROY, Justice.

A Justice of the Superior Court sitting without a jury found the appellant guilty of the crime of assault and battery which assault and battery was of a high and aggravated nature.

From a judgment entered on such verdict this appeal has resulted.

We deny the appeal.

The circumstances surrounding the death of baby Nicholas Danforth on November 11, 1973, was such that police officers charged with the investigation of the death of the baby were caused to suspect that the injuries which brought about the death may have been intentionally inflicted by someone. Almost from the time the investigation first started suspicion centered on the appellant.

The officers believed there was reason to conclude not only that the appellant had inflicted the injuries but that he had done so under circumstances that the death resulting therefrom constituted homicide punishable as murder.

The appellant was consistent in his denial that he had ever intentionally brought about the child's death.

A State police detective then asked the appellant if he would be willing to take a lie detector test. The appellant unhesitatingly agreed. Shortly thereafter appellant and his attorney traveled to Augusta to the Attorney General's office where they were met by a polygraph expert from the Maine State Police. A polygraph test was then administered.

Only the appellant and the testing machine operator were in the room when the test was administered. The defendant's attorney and the Attorney General remained outside the room at the request of the testing machine operator.

There is no question but that a *"Miranda"* warning was given to the appellant before the testing procedure was commenced.

As a result of the test, the officers investigating the death of Nicholas Danforth and the Attorney General became satisfied appellant ought not be charged with *"murder."* Rather, an indictment charging appellant with homicide under such circumstances as to be punishable as *"manslaughter"* was sought from the grand jury and returned by them.[1]

At the trial, which is the subject of this appeal, the appellant stood charged with *"manslaughter."*

It is now apparent that during the course of the polygraph testing the appellant made certain admissions which, when

---

1. The indictment charged common-law manslaughter and not that portion of 17 M.R.S.A. § 2551 which proscribes, "being under the legal duty to care and provide for any child or other person, willfully fails or neglects to provide for such child or other person neces-

sary food, clothing, treatment for the sick or other necessaries of life, thereby causing or hastening the death of such child or other person." Our decision that assault is a lesser included offence of "manslaughter" relates only to "manslaughter at common law."

they were received in evidence, formed the basis for the Court's conclusion that the appellant was guilty of assault and battery high and aggravated.

The appellant has preserved the points on appeal which he now makes by seasonably objecting to the receipt in evidence of such admissions.

This Court has consistently ruled that not only are polygraph tests inadmissible, but also that evidence that a defendant agreed to take a polygraph test, or refused to take such test, is not admissible. *State v. Casale*, 150 Me. 310, 110 A.2d 588 (1954); *State v. Mottram*, 158 Me. 325, 184 A.2d 225 (1962); *State v. Mower*, Me., 314 A.2d 840 (1974). This is so because *"such tests have not reached the stage of scientific development and accuracy that permits admissions of the result in evidence." State v. Mower, supra* at 841.

The real question becomes whether or not admissions made during the polygraph examination are admissible if made voluntarily.

The presiding Justice at the conclusion of the evidence said to the defendant, among other things,

*"I am predicating your guilt of the crime of assault and battery of a high and aggravated nature, a lesser offense of manslaughter, and basing it upon the statements that you made before the polygraph examiner, . . ."*

Concerning the circumstances surrounding the taking of the polygraph test and the statements made during the process, the record is very clear.

After preliminary information was given to the defendant by the polygraph operator the testing was begun. This entire testing process was accomplished in approximately seven minutes. The testing consisted of the polygraph operator asking the defendant a series of questions. As he answered the questions, the operator noted certain reactions indicated by the polygraph. During the time of the actual test the defendant was alone with the polygraph operator. His attorney and the Assistant Attorney General had been asked to leave the room by the polygraph operator.

After the testing had taken place and the machine made inoperative, of which the defendant was aware, the polygraph operator asked Mr. Bowden to clarify certain reactions to the test.

The polygraph operator testified in part as follows:

*"The first test he was asked, among other questions, 'Did you deliberately strike Nickie's head with anything?' His answer was 'No.' There was a specific reaction to that question . . . . In his explanation, he stated, 'I hit him in the head with a baby's bottle.'"*

After a wait of approximately thirty minutes, a second testing procedure was undertaken.

At the trial the polygraph operator was asked this question:

*"Q. All right. Now, after the completion of the second test, would you again tell us what the conversation was that you had with the Defendant and what he said to you in response to your? (sic)"*

*The witness answered:*

*"A. I told him that during the second exam there was a specific reaction to one of the questions. The question was, 'Did you hit Nickie in the head with anything but a plastic bottle?' His answer was, 'No.' There was a specific reaction to the question. I asked him if he could explain this. He said, 'Well, there were two bottles in the crib, one empty and one about half full, or so.'"*

Later a third testing procedure was undertaken during which eleven questions were asked of the defendant. The poly-

graph operator at trial was then asked this question:

"*Q. All right. Now after the completion of the third test, what took place?*"

He answered:

"*A. I again informed Mr. Bowden that there were reactions to some of the questions. I asked him to explain what they might be. One of the questions was, 'Did you strike Nickie that Saturday with your hands?' His answer was, 'No.' There was a specific reaction. And he explained it by saying, 'I did cuff him on the head but not that hard.'*"

Later the witness testified:

"*A. He admitted having poked Nickie in the chest at times.. I asked if, keeping in mind the age of the baby, in his opinion these pokes would have caused the many bruises on his chest, and he replied, 'Yes.' He admitted to having struck Nicholas at several times at different times, and tossing him around, the striking being done on purpose but not with the intention of causing him permanent injury. He admitted that the plastic bottle that he struck Nickie with had fluid in it, half full or so. He would not admit and did not admit to having struck him in the head with anything else.*"

"*Q. All right. Did he say anything else with reference to the child's death?*"

"*A. He said that he had struck Nickie many times and sometimes did other things, but only to make him mind. He said that he felt responsible for the child's death. But that he had done nothing to Nickie to purposely cause him injury, only to discipline him.*"

The presiding Justice received the admissions into evidence, after having determined that they were made voluntarily. The conclusions the presiding Justice reached as to defendant's guilt were based substantially upon these admissions.

The defendant argues that because the admissions resulted from reactions to questions asked during the testing, the effect of the Court's ruling was to permit the results of the polygraph tests to be received in evidence.

In his brief the defendant cites *State v. Arnwine*, 67 N.J.Super. 483, 171 A.2d 124 (1961),[2] as authority for his position that the admissions should not have been received in evidence.

In *Arnwine* it is said:

"*If the results of a polygraph test are not admissible evidence by direct testimony, any effort, design or circumstances that would accomplish such an objective indirectly or. inferentially, as here, should not be condoned.*"

The appellant suggests in his brief that *Arnwine* has been "*specifically cited with approval*" by the Supreme Judicial Court of Massachusetts in *Commonwealth v. Fatalo*, 346 Mass. 266, 191 N.E.2d 479 (1963).

*Arnwine* contained an extensive and scholarly discussion of the asserted unreliability of polygraph testing. It is this discussion in *Arnwine* which the Massachusetts Court "*specifically cited with approval.*"

The Supreme Court of Pennsylvania in *Commonwealth v. Hipple*, 333 Pa. 33, 3 A. 2d 353 (1931), had occasion to deal with a question not dissimilar from that with which we are faced. There, as here, after undergoing a polygraph test the accused made admissions which had been received in evidence at his trial. The Court said:

"*The statement by the officers, 'You can lie to us but you cannot lie to this*

2. We note that the *Arnwine* opinion was not that of a court of last resort. We also note, as was pointed out in a concurring opinion in that case, the quoted statement is "*dictum.*"

machine,' *in substance amounts to no more than the familiar phrase,* 'It would be better for you to tell the truth,' *which this court has often sanctioned. Com. v. Weiss,* 284 Pa. 105, 130 A. 403; *Com. v. Spardute,* [278 Pa. 37, 122 A. 161] *supra. Here no inducement of material reward nor fear of punishment, conducive to eliciting an untrue statement, was employed. . . . It may be that it was the use of the lie detector which produced the confession. This would seem certain if it were not for the fact that it was not until two hours after the use of the device, during which time defendant had time for reflection and composure, that he confessed. It is quite possible that he was persuaded to do so by the use of the machine and what the officers told him concerning it. The record of the lie detector was not offered in evidence. Since the use of the device was for the purpose of inducing the defendant to tell the truth and not anything was done to influence him to do otherwise, an objection based solely on the fact that he was thus induced to confess cannot be sustained."* 3 A.2d at 356.

See also *State v. Keiper,* Or.App., 493 P.2d 750 (1972).

█ While we remain firm in our previously announced position that the results of a polygraph test are not admissible in evidence because their inherent reliability has not been accepted in the scientific community, we conclude that admissions made by an accused after the polygraph testing procedure has terminated, although made in response to questions prompted by the polygraph examiner's interpretation of *"reactions to questions asked during the testing,"* are admissible if such admissions are found to be voluntary beyond a reasonable doubt.

█ We hold it was not error for the Court to receive these admissions into evidence.

The second claim raised by appellant is that assault and battery high and aggravated is not a lesser included offense of the crime of manslaughter. If the appellant is correct in his contention, the judgment entered by the Court was one which is not legally sustainable under the holdings of this Court in *State v. Leeman,* Me., 291 A.2d 709 (1972), and *Bessey v. State,* Me., 297 A.2d 373 (1972)

In *Leeman,* supra, we quoted from Professor Orfield's comment on Federal Criminal Rule 31(c) that,

*"To be necessarily included in the greater offense the lesser offense must be such that it is impossible to commit the greater without having committed the lesser."* 291 A.2d at 711.

We then proceeded to announce as the law of Maine that there can be a conviction of a lesser offense than that charged only if the lesser as legally defined is necessarily a constituent part of the greater. If the lesser offense requires the necessary inclusion of an element not included in the greater offense, the lesser is not included in the greater.

In *Bessey* we said that a specific subjective state of mind of intent or design to kill must be proved beyond a reasonable doubt in order to properly convict one of assault with intent to kill. Subjective state of mind or intent or design or purpose to kill need not be demonstrated as a condition of the validity of a conviction for "murder". Since a subjective purpose to kill is necessary to be proved if conviction is to be properly had when one is charged with assault with intent to kill, it necessarily follows assault with intent to kill is not a lesser included offense of homicide under such circumstances as to be punishable as "murder".

Appellant reasons by analogy that assault and battery high and aggravated cannot be a lesser included offense of homicide punishable as "manslaughter". His major premise for such conclusion is that

assault and battery by definition requires a subjective purpose to do some violence, or as he says, assault is a specific intent crime while homicide punishable as manslaughter is not.

In the sense in which we understand the appellant uses the term "specific intent" we conclude his major premise is faulty.[3]

In *State v. Anania,* Me., 340 A.2d 207 (1975) in speaking of the crime of assault and battery we said,

> "*An* 'intention . . . to do some violence' *may be established, given appropriate facts, by evidence of a specific, subjective purpose* 'to do some violence.' *However, it is equally clear that proof of the requisite* 'intent' *is not necessarily confined to such evidence. This statutory language is not calculated to require as indispensible proof of a subjectively existing conscious purpose* 'to do some violence.' *Criminal* 'intent' *may equally well flow, as a matter of law, from intentionally doing an act which has the inherent potential of doing bodily harm, and doing so in a criminally negligent manner. This position is not inconsistent with any of our prior decisions and finds general support elsewhere. Hutchins v. State,* 265 A.2d 706 (Me. 1970); *State v. Brough,* 112 N.H. 182, 291 A.2d 618 (1972); *State v. Chiarello,* 69 N.J.Super. 479, 174 A.2d 506 (1961); see *State v. Evans,* 165 Conn. 61, 327 A. 2d 576 (1973); *State v. Worrey,* 322 A. 2d 73 (Me.1974); *see also Parker v. United States,* 123 U.S.App.D.C. 343, 359 F.2d 1009 (1966); *State v. Farmer,* 324 A.2d 739, n. 6 at 747 (Me.1974)."

In *Anania* supra, we cut behind those terms to determine exactly what it was the Legislature intended by the phrase "intention to do some violence".[4] We explained that with reference to the Assault Statute (17 M.R.S.A. § 201) a culpable state of mind exists not only when there is a specific subjective purpose to do some violence but also when there is a voluntary act which has the inherent potential of doing bodily harm when the act is done in a criminally negligent manner. To constitute an Assault under our Statute, there must be a *subjective intention* to do the act, *but there need not be a subjective intention to bring about the result,* i. e., some violence. To state it another way, assault cannot result from pure accident. Assault can result from the intentional doing of an act in reckless and wanton disregard of the safety of others which brings about the assault, *State v. Barnett,* 150 Me. 473, 114 A. 2d 245 (1955). It follows then a subjective purpose to do some violence is no more necessary to be proved in an assault case than in a "homicide under such circumstances as to constitute manslaughter".

■ We conclude that Assault and Battery is a lesser included offense in the crime of "Manslaughter". It was legally appropriate for the Court to have rendered a verdict of Assault and Battery, high and aggravated, after hearing on an indictment charging "Manslaugher".

Appellant urges that there was no factual basis for the finding that the Assault and Battery was "high and aggravated".

■ The Court had before it evidence the child assault victim was of tender

3. See *State v. Worrey,* 322 A.2d 73, 80 (Me. 1974).

4. We note Assault is described in the Maine Criminal Code (P.L.1975 Ch. 499 approved June 18, 1975, effective March 1, 1976) as follows: "*A person is guilty of Assault if he intentionally, knowingly, or recklessly causes bodily injury or offensive physical contact to another.*" "Intentionally" is described in the Code in this way: "*A person acts intentionally with* respect to a result of his conduct when it is his conscious object to cause such a result.*" Of "Knowingly" the Code says, "*A person acts knowingly with respect to a result of his conduct when he is aware that it is practically certain that his conduct will cause such a result.*" "Recklessly" is explained as follows: "*A person acts recklessly with respect to a result of his conduct when he consciously disregards a substantial and unjustifiable risk that his conduct will cause such a result.*"

years. The Appellant was a grown man. The evidence warranted the conclusion that the child was struck about the head and chest with sufficient force to leave "black and blue" marks. The extent of the force used and the age of the child were clearly sufficient circumstances to compel the conclusion that the blows the Appellant admits he struck constituted Assault and Battery of a high and aggravated nature.

We have carefully examined the other claims of error which the Appellant urges.

We find them to be without merit.

We are satisfied justice has been done.

The entry must be,

Appeal denied.

All Justices concurring.