2003 ME 40

**STATE of Maine**

v.

**Barry McCARTHY.**

Supreme Judicial Court of Maine.

Argued: Nov. 14, 2002.
Decided: March 24, 2003.

---

G. Steven Rowe, Attorney General, Donald W. Macomber, Asst. Attorney General (orally), Lisa P. Marchese, Asst. Atty. Gen., William Baghdogan, Asst. Atty. Gen., Augusta, for State.

Jeffrey C. Toothaker (orally), Steven Juskewitch, Ellsworth, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

DANA, J.

[¶ 1] Barry McCarthy appeals from a judgment of conviction entered in the Superior Court (Hancock County, *Mead, J.*) on his conditional plea to murder in violation of 17–A M.R.S.A. § 201(1)(A) (1983).[1] McCarthy entered his conditional plea pursuant to M.R.Crim. P. 11(a)(2) following the court's denial of his motions to suppress his statements to the police on February 13, 1999. McCarthy here argues that the court erred when it determined that (1) his February 13, 1999, confession to the police was voluntary, and (2) the attorney for the State did not violate the Maine Bar Rules when she advised the State Police officers who thereafter took his statement. Finding no error, we affirm.

## I. BACKGROUND

[¶ 2] On February 2, 1999, the Maine State Police charged McCarthy in Ellsworth District Court with the murder of Ila Boyle. Because he was classified as a "maximum-security inmate" based on prior conduct, and the Hancock County Jail lacked maximum-security facilities, he was transferred to the Cumberland County Jail's maximum-security unit.

[¶ 3] On February 12, McCarthy asked a jail guard to contact the State Police on his behalf, and gave the guard a written request to talk to State Police Detectives Steven Pickering or David Preble, or Officer Jackie Theriault. The guard gave the note to his supervisor. On February 13, McCarthy again asked the guard to contact the State Police, and the guard told

him he had given the information to his supervisors. Continuing his efforts to make contact, McCarthy tried to place a collect phone call to the home of Officer Theriault, who was on vacation. While on vacation, she telephoned McCarthy. Theriault testified:

> Basically he said that he wanted ... to meet with me, to be able to talk to me. He indicated that his attorney did not know that he was calling me. He did not want me to tell his attorney that he was calling. He ... knew he was going to be in jail for sometime because of this and he wanted to be transferred to the Thomaston jail, did not want to stay in Cumberland. And that ... he would give up the whole issue on how Ila Boyle had been murdered.

When Theriault said she could not see him for almost a week, he told her

> he didn't want to wait that long, ... he said, I will talk to either Detective Pickering or Detective Preble, and he also indicated he even would talk to the lady prosecutor at the AG's Office.... I told him I would see what I could do to try to get ... somebody to make contact with him.

[¶ 4] Theriault then notified Assistant Attorney General Lisa Marchese, the prosecutor assigned to the case, of McCarthy's request. Marchese told her it was all right for the police to talk with him under certain conditions which, at the motion hearing, she described as follows:

> My advice to [Theriault] was first to confirm that the defendant had initiated contact with the state police ... and then I told her that under United States Supreme Court law and under Maine court law that she would be entitled to send someone down to speak with Barry McCarthy provided that he was Mi-

---

1. McCarthy was sentenced to forty-five years in prison for the crime.

randaed. I told her to videotape or to have someone videotape the conversation. And I also told her that I wanted him told that this would be against the advice of his lawyer; that he understood that his lawyer would not want him speaking to us.

[¶ 5] Marchese acknowledged that Theriault had told her that "the defendant wanted to be moved to the Maine State Prison," but that "I said to [Theriault], there can be no promises here.... [I]f he wants that promised, we can't talk to him." She said the State Police routinely consult her about decisions when she is assigned to a homicide investigation, and that in homicide cases, "important decisions are generally not made without the advice and consultation of somebody from our office."

[¶ 6] On February 13, 1999, at the Cumberland County Jail, in a videotaped interview without his counsel present, McCarthy confessed to Maine State Police Detectives Preble and Zamboni that he had murdered Boyle. Preble, who had phoned Marchese for advice immediately before the meeting, received the same warnings as had Theriault. He testified that Marchese

informed me that when you go down there, videotape it, audiotape it inside the jail, read *Miranda* to him, have him sign off on it, inquire of him as to why you're there, per his request, make sure. ... he knows that this is against his attorney's wishes.... And then if he still wants to, tell him there is [sic] no promises, no nothing that he's going to Thomaston, going anywhere. And then if he still wants to talk to you, let him talk to you.

[¶ 7] At the outset of the videotaped interview, after the *Miranda* warnings but before McCarthy confessed, he told the two detectives he had initiated contact with the police because he wanted "to just come clean about everything. Get this whole mess just put behind me." Asked whether he expected something in return, he replied, "Just to be placed in the Maine State Prison ... [f]or holding." Preble told him:

I was relayed to state to you, ok, that we cannot guarantee any of that, ok, we cannot make any deals with you for you to talk with us, it is against your rights or anything else. Ok? What I can tell you ok, and if you been around long enough to know how things go on, is, usually when you're arrested and charged with an offense such as murder, ahh, sometimes you are held in the county jail until the court, trial, ok, and most often though, you're held in the Maine State Prison, ok? Your question, and I'm not guaranteeing you anything, I'm just telling you, if you was to talk to us after I tell you this, it's up to you, ahh, most likely it's the call between administrations everywhere, whether or not you go to the prison today, tomorrow or a year from now, I can't tell ya. Ahh, but I think you've been around long enough to know that ahh, usually cooperation gets a little bit of favoritism, but I can not guarantee you that. Ok? Ahh, and I can't tell you anymore than that. I mean, you're going to have to judge it upon your own, you know, your own mind whether or not you think you'll be there next week. Ok? Ahh, and go from there, I mean strings are pulled but we cannot promise you that and I don't want to promise you that, I want to say that you know, or you come back next week and say well, I talked to them because they promised me I'd go to the prison and I didn't end up to the prison, I cannot do that. Ok? You know as well as I do that your chances of going to the prison are probably real good but I cannot promise you that. As long as we

understand that. Ahh, you know, are you satisfied with that answer?

McCarthy replied, "That's fine." Preble then told him that "if you talk to us, ... you're going against your attorney's advice." McCarthy replied, "Oh, I know that." Preble then asked, "[D]o you feel that you're being pressured by us to talk at all?" McCarthy replied, "No." Preble then told him:

> To be honest Barry, if you told us you don't want to talk, see you later, we take off, ok, just like that. But, you initiated the call for us to come down here and naturally we're gonna come and check it out ok, and see what's what. But again, and this is taking a little while because I just want to make sure you understand I can't promise you you'll go to prison, you know as well as I do, you may end up there, I'm not sure, but we're here to listen to you. If you want to talk to us, we're going to listen, and I'm sure we'll have some follow-up questions afterwards. Ok? And basically, do you feel like talking with us?

McCarthy replied, "Yes."

[¶ 8] Later, charged with the murder, McCarthy pled not guilty and moved twice to suppress his February 13 confession, claiming it was a "legally involuntary statement ... obtained by the Assistant Attorney General in violation of M.B.R. [Maine Bar Rules] Disciplinary Rule 3.6(f)" and calling it an "unauthorized statement ... obtained in secret by Maine State Police ('MSP') detectives acting on the advice and under the direction of the Attorney General's Office (who all failed to inform the Defense)." McCarthy contended the confession was "obtained by bending the rules and by coercion ...."

[¶ 9] In September 2001, the Superior Court denied McCarthy's motions to suppress, stating, "As the court finds no promises of leniency, and no overt viola-tions of the Maine Bar Rules, the court concludes that the State has carried its burden of proof" that McCarthy had confessed voluntarily. McCarthy then entered a conditional plea of guilty; the Superior Court accepted his plea and thereafter imposed a forty-five year term of imprisonment.

## II.  DISCUSSION

### A.  Voluntariness of the Confession

[¶ 10] We first consider whether the Superior Court properly denied McCarthy's motions to suppress because his confession was voluntary. McCarthy contends that his confession was not voluntary, because it was induced by an implied police promise of a transfer from the Cumberland County Jail to the Maine State Prison. He asserts, "The evidence in the record is clear and uncontroverted that [I] sought to sell [my] confession for a transfer from isolation at CCJ to the general population at the Maine State Prison."

[¶ 11] "Whether a confession is voluntary is primarily a question of fact, and we review the suppression judge's determination for clear error. The suppression judge must consider the totality of the circumstances in determining whether a confession is voluntary, and the inquiry is fact intensive." *State v. Coombs*, 1998 ME 1, ¶ 7, 704 A.2d 387, 389–90 (citations omitted). Because the suppression judge has observed the witnesses and weighed their credibility, we review the judge's determination of factual issues deferentially under the clear error standard. *Id.* We review the application of legal principles to those findings independently, however, because we are in as good a position as the trial judge to decide whether those particular facts warrant a legal conclusion. *Id.* ¶ 8.

[¶ 12] Only a voluntary confession is admissible into evidence, and the State must prove voluntariness beyond a reasonable doubt. *Id.* ¶ 10. A voluntary statement is one that "is the result of defendant's exercise of his own free will and rational intellect," *State v. Sawyer*, 2001 ME 88, ¶ 8, 772 A.2d 1173, 1175 (internal quotation marks and citation omitted), as opposed to one that results from "threats, promises or inducements made to the defendant," *id.* ¶ 9. Confessions made in return for assurances or promises of leniency are inadmissible. *State v. Tardiff*, 374 A.2d 598, 600 (Me.1977). "In determining whether a confession was the product of improper inducements, all of the circumstances attending the making of that confession must be examined." *Tardiff*, 374 A.2d at 601. When a defendant wrongly believed officers were making an implied promise of leniency by suggesting that it would be better for him to tell the truth, we have nonetheless deemed the confession voluntary, albeit unwise. *See, e.g., State v. Theriault*, 425 A.2d 986, 990 (Me.1981); *State v. Hutchinson*, 597 A.2d 1344, 1346 (Me.1991) (stating "[t]the precise question is whether a statement made for an illogical reason requires a finding of involuntariness. The answer is no.").

[¶ 13] In the instant case, the operative question is whether the police proffered an inducement to McCarthy to confess, or whether he chose rationally to confess in the mere *hope* that a confession would net him a move to the Maine State Prison. The court found the facts "well established ... and ... uncontroverted" that McCarthy initiated contact with the police

"in the hope of obtaining less restrictive housing conditions." The court found that the police had "advised ... they could not control his placement, but suggested that cooperation often results in favorable treatment," and that "[a]fter indicating his desire to speak further, and after waiving his *Miranda* rights, [McCarthy] made an inculpatory statement." Prior to the statement, the court noted, McCarthy "acknowledged that his attorney would not approve of what he was doing." After weighing the conflicting testimony of two psychologists, the court was convinced that McCarthy's confession was voluntary and that his "decision making process may have been impulsive and unsophisticated, but it clearly represented a rational process—a goal was identified and a plan was followed." The court found "no promises of leniency" and concluded that the State had met its burden of proof.

[¶ 14] The court's factual findings were rational and support the legal conclusion that his confession was voluntary beyond a reasonable doubt.

## B. Bar Rule Violation and Suppression

[¶ 15] McCarthy next argues that the Superior Court erred in failing to suppress his confession, because Attorney Marchese violated Maine Bar Rule 3.6(f) [2] when she authorized police contact with McCarthy and advised the police on how to handle the meeting, although she knew McCarthy's lawyer would not be present. He claims that because the police acted as Marchese's agents in meeting with him, she should have obtained his lawyer's prior consent, and that the court's proper re-

---

2. Maine Bar Rule 3.6(f) states in relevant part:

**Communicating With Adverse Party.** During the course of representation of a client, a lawyer shall not communicate or cause another to communicate on the subject of the representation with a party the lawyer knows to be represented by another lawyer in that matter unless the lawyer has the prior consent of the lawyer representing such other party or is authorized by law to do so.

M. Bar R. 3.6(f).

sponse to her alleged violation of Rule 3.6(f) is suppression of his confession.

[¶ 16] We need not decide whether Marchese violated Rule 3.6(f) because even if she had, suppression would not be the remedy absent an independent constitutional or statutory basis for the suppression of the evidence.[3]

[¶ 17] The Maine Bar Rules support the conclusion that suppression is an inappro-

priate response to infraction of a rule of professional and ethical conduct. Under our Rules, Marchese is only *personally* subject to the disciplinary jurisdiction of the Court. *See* M. Bar R. 1(a),[4] 2(c),[5] 2(d).[6] Moreover, nearly every court that has ruled on the issue has found that suppression of a confession is an inappropriate remedy for a lawyer's ethical violation.[7]

[¶ 18] Furthermore, we want to encourage the police to consult the State's attor-

---

3. We disavow a possible inference that we have concluded Marchese's actions were unethical. *See* M. Bar R. 7.2(b)(1) and (2).

4. Rule 1(a) reads in pertinent part:
   Any attorney admitted to, or engaging in, the practice of law in this State shall be subject to the Court's supervision and disciplinary jurisdiction and the provisions of these rules, including Maine Bar Rule 1(b). A lawyer admitted to practice in this State is subject to the Court's disciplinary authority, regardless where the lawyer's conduct occurs.
   M. Bar R. 1(a).

5. Rule 2(c) reads in pertinent part:
   **Grounds for Discipline.** Each act or omission by an attorney, individually or in concert with any other person or persons, which violates any of these rules shall constitute misconduct and shall be grounds for appropriate discipline .... The failure without good cause to comply with any rule, regulation or order of the Board [of Overseers of the Bar] or the Grievance Commission ... shall constitute misconduct and shall be grounds for appropriate discipline.
   M. Bar. R. 2(c).

6. Rule 2(d) reads in pertinent part: "**Types of Discipline.** Discipline of attorneys may be: (1) by disbarment, suspension, or public reprimand by the Court; or (2) by public reprimand by the Board or by a panel of the Grievance Commission." M. Bar. R. 2(d).

7. *See People v. Green,* 405 Mich. 273, 274 N.W.2d 448, 454 (1979) ("The admissibility of evidence in a court of law ... is normally determined by reference to relevant constitutional and statutory provisions, applicable court rules and pertinent common-law doc-

trines. Codes of professional conduct play no part in such decisions.... [A] violation of [a bar rule] standing alone should be dealt with by bar disciplinary action rather than by withholding relevant and material evidence from the jury."); *Suarez v. State,* 481 So.2d 1201, 1207 (Fla.1985) (agreeing with the reasoning in *Green* and adding, "In the absence of constitutional grounds for suppression, the only possible basis for suppression would be to discourage violation of [a bar rule].... However, we have another effective way to deter violation of an ethical rule. Bar discipline can be initiated by The Florida Bar ...," thus achieving the goal without the "overkill" of suppression.); *State v. Johnson,* 318 N.W.2d 417, 437 (Iowa 1982) ("The alleged ethical violation should be considered by the Committee on Ethics and Conduct of The Iowa State Bar Association in accordance with [a] Court Rule .... It does not in any event require exclusion of the evidence in question in this case.... [W]e refuse to exclude relevant evidence by applying the exclusionary concept to conduct which is not of constitutional magnitude."); *State v. Morgan,* 231 Kan. 472, 646 P.2d 1064, 1070 (1982) ("[T]he function of the Code of Professional Responsibility is to prescribe the standards of conduct for members of the bar. The provisions of the Code are unrelated to the admission of evidence."); *State v. Decker,* 138 N.H. 432, 641 A.2d 226, 230 (1994) ("The New Hampshire Rules of Professional Conduct are aimed at policing the conduct of attorneys, not at creating substantive rights on behalf of third parties."); and *In re Howes,* 123 N.M. 311, 940 P.2d 159, 167 (1997) ("[M]any courts have recognized that the public would be ill-served if the misconduct of an individual attorney permitted an otherwise guilty person to go free.").

ney so that they avoid inadvertently violating a defendant's rights. To suppress a confession obtained following a bar rule violation would discourage police consultations with counsel. *See State v. Piorkowski,* 243 Conn. 205, 213, 700 A.2d 1146, 1154 (1997) ("If we were to rule that the police acted as agents in this case because they sought advice from the state's attorney, we would discourage the police from seeking such advice regarding the propriety of their conduct in the future. This we decline to do.").

[¶ 19] Even if Marchese had violated Rule 3.6(f), suppression of McCarthy's confession would not be an appropriate remedy.

The entry is:

Judgment affirmed.