2010 ME 76

**STATE of Maine**

v.

**Mark C. LAVOIE.**

Supreme Judicial Court of Maine.

Argued: June 15, 2010.

Decided: Aug. 10, 2010.

Clifford Strike, Esq. (orally), Strike, Goodwin & O'Brien, Portland, ME, for Mark Lavoie.

Geoffrey A. Rushlau, District Attorney, Patricia A. Mador, Asst. Dist. Atty. (orally), Bath, ME, for the State of Maine.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

Majority: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

Concurrence: ALEXANDER, and LEVY, JJ.

MEAD, J.

[¶ 1] Mark C. Lavoie appeals from a judgment of conviction of one count of unlawful sexual contact (Class B), 17–A M.R.S. § 255–A(1)(E–1) (2009),[1] entered in

1. The pertinent portion of 17–A M.R.S. § 255–A (2009) provides:

the Superior Court (Sagadahoc County, *Brodrick, J.*) following a jury trial. Lavoie argues that the court (*Mills, J.*) erred in denying his motion to suppress statements made during a polygraph examination because various statements and actions by detectives during the examination constituted coercive police conduct and rendered his statements involuntary. We affirm the judgment.

## I. BACKGROUND

 [¶ 2] Viewing the evidence in the light most favorable to the court's order on the motion to suppress, *see State v. Bailey*, 2010 ME 15, ¶ 3, 989 A.2d 716, 718, and to the jury's verdict, *see State v. Rancourt*, 435 A.2d 1095, 1097 (Me.1981), the record supports the following facts.

[¶ 3] On October 13, 2007, around 7:00 p.m., Lavoie and his family, the nine-year-old victim and her family, and several other children and adults were at the Lavoies' campsite in Phippsburg. While the adults talked around the campfire, the children played a game of hide-and-seek nearby. Between fifteen and thirty minutes later, Lavoie, aged thirty-seven, joined the game of hide-and-seek. As Lavoie and the victim were hiding behind a car, Lavoie put his hand inside her sweatpants and directly touched her genitals. After Lavoie and the victim moved to another hiding spot for a brief period, the victim left and told her mother what had happened.

[¶ 4] The police were summoned and Detective Chad Charleton spoke with Lavoie after advising Lavoie of his *Miranda* rights and obtaining a waiver. After some additional investigation, Charleton reminded Lavoie of his *Miranda* rights and interviewed him again. During this interview, Lavoie volunteered to take a lie detector test. Over the course of the next month, Lavoie and Charleton corresponded several times about scheduling a polygraph test.

[¶ 5] On November 13, 2007, Lavoie drove with his wife to the State Police Crime Laboratory in Augusta to take the polygraph test. The entire examination, which began at 10:18 a.m. and lasted for four hours, was recorded continuously on video. The pre-test interview, the polygraph test itself, and a portion of the post-test interview were conducted solely by Detective Michael Mitchell. Detective Charleton watched these portions of the examination via a monitor in another room. During the examination, neither detective was in uniform or carrying a visible weapon. Lavoie and Mitchell sat five to six feet apart in a room measuring ten by fourteen feet with an eight-foot ceiling.

[¶ 6] Detective Mitchell conducted the test according to his standard procedure. He explained Lavoie's *Miranda* rights, had Lavoie repeat them, and reviewed the *Miranda* waiver form. After Mitchell told Lavoie that the test was voluntary and that Lavoie could stop it at any time and it would not be held against him, Lavoie signed the *Miranda* waiver form. Mitchell told Lavoie that the door was closed for privacy, but that it was not locked and that Lavoie could leave if he wanted to stop the test. During the pre-test interview, Lavoie told Mitchell that he was in "pretty good" health, had slept "good" the previous night, and was not under the influence of any substances.

1. A person is guilty of unlawful sexual contact if the actor intentionally subjects another person to any sexual contact and:
 . . . .

E-1. The other person, not the actor's spouse, is in fact less than 12 years of age and the actor is at least 3 years older. Violation of this paragraph is a Class B crime.

[¶ 7] Detective Mitchell then told Lavoie how the polygraph machine worked. During this explanation, he stated, "And all the results are recorded right here in the computer screen. All right? It's foolproof." Following a fifteen-minute break, during which Lavoie left the room, Mitchell formulated some control questions. Mitchell left the room for five minutes. Next, Mitchell asked Lavoie the set of control questions once, attached the polygraph machine's implements to Lavoie, and conducted the test by asking him the entire set of control and crime-related questions four times. At the conclusion of the test, Mitchell told Lavoie that he had failed it. Mitchell then began the post-test interview, trying to elicit a confession. Fourteen minutes later, Detective Charleton joined him and both questioned Lavoie.

[¶ 8] The detectives asked Lavoie whether his alcohol consumption had affected his behavior on the night of the incident. They told him that they could get him help for his alcohol problem and that he needed to "step up to the plate" and admit that he made a mistake. Lavoie then stated,

> I screwed up.... I put my hands on her. That was it. I don't remember what I was doing, why I was doing it.... That was it. We were squatting down behind the car and I just put my hands on her.... In her pants.... I'm telling you, I don't really remember. That's all I remember.

[¶ 9] Detective Charleton suggested that Lavoie write an apology letter and Lavoie asked to speak with his wife. All three stood up, and Detective Mitchell told Lavoie that he wanted Lavoie to come back to write the apology letter. They then took a fifteen-minute break, during which Lavoie and his wife spoke outside the building.

[¶ 10] After the break, Detective Charleton reminded Lavoie that he was free to leave at any time; Detective Mitchell did not rejoin them in the examination room. Lavoie asked to whom the letter should be addressed and Charleton suggested the victim. Lavoie wrote out a general apology, saying he was "so sorry about what happened." Charleton suggested he be more descriptive to show he had owned up to specific actions and then said, "but it's up to you." Lavoie added to his previous apology:

> Putting my hand down your pa[nt]s was wrong and being an adult I should know these things[.] [A]gain I am sorry I cannot apol[o]gize enough to make this go away but just know that deep down in my heart I am.
>
> [Lavoie's Signature]
> 11/13/2007

The session concluded four minutes later.

[¶ 11] After Lavoie was indicted, he moved to suppress his verbal and written confessions on the ground that they were involuntary. Lavoie contended that Detective Charleton had promised to get him help with his alcohol problem if he confessed and that he instructed Lavoie what to write in the apology letter. The court denied the motion, concluding that the State had proven beyond a reasonable doubt that Lavoie's confession was voluntary. The court found that Lavoie knowingly waived his *Miranda* rights, understood that he did not have to take the test, and knew that he could end the test at any time. The court also found that the detectives did not tell Lavoie what to write or coerce him with threats or promises. Finally, the court found that his confession was not motivated by the suggestion that he would get alcohol treatment and that he "was not under arrest and appeared calm and appropriately responsive throughout the process."

[¶ 12] On September 16, 2009, the jury found Lavoie guilty of unlawful sexual contact. He was sentenced to eight years' imprisonment, all but five years suspended, with six years of probation, and ordered to pay $8840 in restitution for the victim's counseling expenses. In December 2009, we denied Lavoie's application to appeal his sentence. This appeal followed.

## II. DISCUSSION

### A. Standard of Review

[¶ 13] We review a trial court's denial of a motion to suppress and its determination of whether a confession was voluntarily made using a two-part test. *State v. Donatelli*, 2010 ME 43, ¶ 10, 995 A.2d 238, 241; *State v. Dion*, 2007 ME 87, ¶ 32, 928 A.2d 746, 752. We review the court's factual findings "to determine whether those findings are supported by the record, and [we] will only set aside those findings if they are clearly erroneous." *Bailey*, 2010 ME 15, ¶ 16, 989 A.2d at 721 (quotation marks omitted). If the court's factual findings are undisputed, then "a challenge to the application of those facts to constitutional protections is a matter of law that we review de novo." *Id.* (quotation marks omitted). "Whether a confession is voluntary is primarily a question of fact." *State v. McCarthy*, 2003 ME 40, ¶ 11, 819 A.2d 335, 339.

### B. Admissibility of Evidence Connected to Polygraph Examinations

[¶ 14] We have a long-standing, fundamental concern regarding polygraph machines due to their "non-existent value when it comes to determining credibility," [2] *State v. Harnish*, 560 A.2d 5, 8 (Me.1989) (quotation marks omitted), and "the dangerous possibility that credibility will be evaluated by the device rather than by the trier of fact," *State v. Rameau*, 685 A.2d 761, 764 & n. 8 (Me.1996) (alteration omitted) (quotation marks omitted). Consequently, polygraph test results and a defendant's willingness, or unwillingness, to take a polygraph test are inadmissible. *Harnish*, 560 A.2d at 8; *State v. Trafton*, 425 A.2d 1320, 1322 (Me.1981); *State v. Casale*, 150 Me. 310, 320, 110 A.2d 588, 592–93 (1954).

[¶ 15] The scientific evidence simply does not support the reliability or validity of polygraph examinations.[3] Accordingly, nearly every state either "bar[s] the admission of polygraph evidence outright . . . [or] limit[s] the admission of polygraph evidence to cases where both parties stipulate to its use." *State v. A.O.*, 198 N.J. 69, 965 A.2d 152, 161–62 (2009) (collecting cases); *see also United States v. Scheffer*, 523 U.S. 303, 309–12 & nn. 6–8, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (discussing the contention within the scientific community regarding polygraph examinations and the evolution of their use within state and federal jurisdictions).

[¶ 16] However, we have recognized that "polygraph tests are valuable tools in the investigation of crime, for example, in developing leads," *State v. Mow-*

---

2. In the civil law context, we have also held that "the results of a polygraph examination are entitled to no weight" and that a subject's willingness to take a polygraph test is inadmissible. *Heselton v. Wilder*, 496 A.2d 1063, 1066–67 (Me.1985).

3. *See* Comm. to Review the Scientific Evidence on the Polygraph, Nat'l Research Council, *The Polygraph and Lie Detection* 1–5, 126–

46, 212–16 (2003), *available at* http://books.nap.edu/openbook.php?record_id=10420&page=R1 (describing numerous variables that undermine polygraph tests' efficacy); *see also* Thomas L. Bohan, *Scientific Evidence and Forensic Science Since* Daubert: *Maine Decides to Sit out the Dance*, 56 Me. L.Rev. 101, 117–26 (2004) (discussing the NRC study).

*er*, 314 A.2d 840, 841 (Me.1974) (emphasis omitted) (quotation marks omitted), and that there is a "practical necessity for the use of deception in criminal investigations," *Bailey*, 2010 ME 15, ¶ 23, 989 A.2d at 723 (quotation marks omitted). Therefore, "admissions made by an accused after the polygraph testing . . . although made in response to questions prompted by the polygraph examiner's interpretation of reactions to questions asked during the testing, are admissible if such admissions are found to be voluntary beyond a reasonable doubt." *State v. Bowden*, 342 A.2d 281, 285 (Me.1975) (emphasis omitted) (quotation marks omitted); *accord State v. Patterson*, 651 A.2d 362, 366 (Me.1994).

[¶ 17] Lavoie has invited us to overrule this long-standing precedent and adopt the approach the Montana Supreme Court articulated in *State v. Craig*, 262 Mont. 240, 864 P.2d 1240 (1993). In *Craig*, "the statement made by [a] defendant following a polygraph examination where the police officers used the results of the polygraph to tell the defendant he had lied so as to elicit a statement or confession" was held to be inadmissible. *Id.* at 1242–43. As the dissent in *Craig* noted, however, the voluntariness of a confession should be determined based on the totality of the circumstances, and there is no reason to place "an unjustified restriction on legitimate police interrogation." *Id.* at 1243–45 (Nelson, J., dissenting). On the record before us, we are not persuaded to overturn our thirty-five-year-old rule regarding the admissibility of confessions made in the context of polygraph tests, choosing instead to continue to evaluate each case according to its particular indicia of voluntariness. *See Bowden*, 342 A.2d at 285.

### C. Voluntariness of Lavoie's Confession

[¶ 18] Lavoie argues that his confession during the post-test interview was the product of coercive police conduct and, therefore, involuntary. "A confession is voluntary if it results from the free choice of a rational mind, if it is not a product of coercive police conduct, and if under all the circumstances its admission would be fundamentally fair." *State v. Coombs*, 1998 ME 1, ¶ 10, 704 A.2d 387, 390–91 (quotation marks omitted); *accord State v. Poblete*, 2010 ME 37, ¶ 24, 993 A.2d 1104, 1109–10. In determining voluntariness, we consider the totality of the circumstances, including

> both external and internal factors, such as: the details of the interrogation; duration of the interrogation; location of the interrogation; whether the interrogation was custodial; the recitation of *Miranda* warnings; the number of officers involved; the persistence of the officers; police trickery; threats, promises or inducements made to the defendant; and the defendant's age, physical and mental health, emotional stability, and conduct.

*State v. Sawyer*, 2001 ME 88, ¶ 9, 772 A.2d 1173, 1176. "[T]he State bears the burden of proving voluntariness beyond a reasonable doubt." *Dion*, 2007 ME 87, ¶ 33, 928 A.2d at 752.

[¶ 19] In this case, the totality of the circumstances strongly indicates that Lavoie's confession was voluntary. *See Sawyer*, 2001 ME 88, ¶¶ 9–11, 772 A.2d at 1176–77. Lavoie volunteered to take the polygraph test, communicated with Detective Charleton several times about arranging it, and drove with his wife to the testing site. At the time of the test, Lavoie was thirty-seven years old, was in "pretty good" health, had slept "good" the previous night, and was not under the influence of any medications or substances. During the course of the examination, he was calm and appropriately responsive.

Neither detective administering the test was in uniform or had a visible weapon.

[¶ 20] At the beginning of the examination, Detective Mitchell explained Lavoie's *Miranda* rights to him, which Lavoie waived. Mitchell told Lavoie that he could stop at any time and it would not be held against him, that the door was unlocked, and that he could leave if he wished. Throughout the four-hour proceeding, both detectives were in the same room with Lavoie for twenty-six minutes and they took three breaks totaling about thirty-five minutes. During the final break, Lavoie left the building and spoke with his wife. Although Mitchell asked Lavoie to return to write the apology letter, Charleton reminded him that he was free to leave before he wrote the letter.

[¶ 21] Lavoie argues that his confession was involuntary because Detective Charleton promised Lavoie he would get Lavoie alcohol counseling if Lavoie confessed. While "[a] confession motivated by a promise of leniency by a person with apparent authority to execute the promise is involuntary," *Coombs*, 1998 ME 1, ¶ 11, 704 A.2d at 391, Lavoie does not allege that Charleton promised him leniency in the criminal case against him if he confessed. Moreover, the motion court found that Lavoie was not coerced with promises and that his confession was not motivated by the suggestion that he would get alcohol counseling. These findings are supported by the record. *See Dion*, 2007 ME 87, ¶¶ 33–34, 928 A.2d at 752; *McCarthy*, 2003 ME 40, ¶¶ 12–14, 819 A.2d at 340.

[¶ 22] Lavoie also contends that Detective Charleton told him what to write in the apology letter, rendering it involuntary. When Lavoie asked to whom the letter should be addressed, Charleton suggested the victim. After Lavoie wrote the first paragraph, Charleton suggested making the letter more descriptive to show that Lavoie had owned up to specific actions, but he did not tell Lavoie what to write and said, "it's up to you." Because these findings by the motion court are also supported by the record, we conclude that Charleton's statements regarding the letter were not coercive police conduct. *See Dion*, 2007 ME 87, ¶ 32, 928 A.2d at 752.

[¶ 23] Additionally, Lavoie alleges that, during the pre-test interview, Detective Mitchell told him that the polygraph machine was foolproof while describing its ability to detect lies. A review of the record shows that Mitchell made the "foolproof" remark as part of an explanation of the difference between analog and computerized polygraph machines. In stating that the computer's ability to record physical responses is "foolproof," Mitchell did not make any representations about the machine's ability to detect lies. A statement of this nature does not constitute unlawful police coercion. *See Sawyer*, 2001 ME 88, ¶ 9, 772 A.2d at 1176.

[¶ 24] We have fully considered Lavoie's remaining arguments and do not discuss them further. Because the totality of the circumstances demonstrates that Lavoie's confession was voluntary, *see id.*, ¶¶ 9–11, 772 A.2d at 1176–77, the court did not err in denying his motion to suppress it, *see State v. Reese*, 2010 ME 30, ¶ 4, 991 A.2d 806, 810.

The entry is:

Judgment affirmed.

LEVY, J., with whom ALEXANDER, J., joins, concurring.

[¶ 25] This Court has previously identified three values that are served by the voluntariness requirement: " '(1) it discourages objectionable police practices; (2)

it protects the mental freedom of the individual; and (3) it preserves a quality of fundamental fairness in the criminal justice system.'" *State v. Sawyer,* 2001 ME 88, ¶ 8, 772 A.2d 1173, 1176 (quoting *State v. Mikulewicz,* 462 A.2d 497, 500 (Me. 1983)). I write separately to emphasize that all three values are potentially compromised if a police detective persuades a crime suspect, prior to the administration of a polygraph examination, that the results of the exam are foolproof.

[¶ 26] The Constitution's tolerance for the use of deception as an investigatory tactic by the police is not boundless. *See, e.g., Lynumn v. Illinois,* 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963) (holding confession involuntary when police falsely threatened to remove children from defendant's custody if she did not cooperate); *State v. Byram,* 145 F.3d 405, 408 (1st Cir.1998) (stating that police trickery that rises to the level of coercion may result in determination that a confession is involuntary). A deception that actually compromises a suspect's ability to make a "free choice of a rational mind," *State v. Coombs,* 1998 ME 1, ¶ 10, 704 A.2d 387, 390, is inherently coercive and fundamentally unfair.

[¶ 27] Thus, where a suspect is persuaded, prior to a polygraph examination, that the results are foolproof, there is a heightened risk that the suspect will conform his or her post-examination statements to the allegedly foolproof results of the exam. In such a case, if the court determines that the deception was coercive and prevented the suspect from exercising free will, the resulting confession should be suppressed. *See State v. Davis,* 381 N.W.2d 86, 88 (Minn.Ct.App.1986) (determining that a confession was involuntary where, among other things, the examiner told the suspect that the polygraph test was foolproof); *People v. Leonard,* 59 A.D.2d 1, 397 N.Y.S.2d 386, 393–96 (1977) (holding that a confession was involuntary where, among other factors, during prolonged interrogation, the examiner told the suspect that the polygraph "machine was infallible and knew the truth just like defendant and God.").

[¶ 28] In this case, Lavoie urges us to conclude that the deception—the use of a polygraph examination to prompt his confession—crossed the line, in part because Detective Mitchell persuaded him that the results of the polygraph examination would be foolproof. A review of the record establishes, however, that the suppression court was not compelled to find that this is what occurred. The transcript of the pre-examination interview reflects that Detective Mitchell told Lavoie that, in comparison to the printed results from a traditional analog polygraph machine, a computer's visual depiction of the lines correlating to the physiological responses of the person being examined is foolproof. Mitchell did not tell Lavoie that the polygraph examination's results are foolproof.

[¶ 29] The representation by a polygraph examiner that any aspect of a polygraph examination is foolproof rightfully calls into question the voluntariness of any confession prompted by the examination. The practice should be avoided. Considering Detective Mitchell's representation in the context of the totality of the circumstances presented in this case, I am satisfied that suppression is not warranted and the judgment should be affirmed.